The appeal is dismissed for lack of jurisdiction.

**SOUTHERN UNION GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 81–2032, 81–2164.

United States Court of Appeals, Tenth Circuit.

Jan. 16, 1984.

Rehearing Denied March 15, 1984.

James S.D. Eisenhower, III of McGee & Ketcham, P.C., Washington, D.C. (Robert J. Haggerty and Cameron R. Graham of McGee & Ketcham, P.C., Washington, D.C., Robert A. Rima and Robert B. Rice, Austin, Tex., with him on the brief), for petitioner.

Joseph S. Davies, Jr., Atty., F.E.R.C., Washington, D.C. (Charles A. Moore, Gen. Counsel, and Jerome M. Feit, Sol., Washington, D.C., with him on the brief), for respondent.

Before SETH, Chief Judge, and McWILLIAMS and DOYLE, Circuit Judges.

SETH, Chief Judge.

The principal supplier of natural gas to Southern Union, which was a distributor in the Oklahoma panhandle, was Western Gas Interstate (a wholly owned subsidiary of Southern Union). Additional gas was supplied by local producers, by Cities Service Gas Company, and by Northern Natural Gas Company. The purchases from Cities were under Rate Schedule IRG–1 of Cities' FERC tariff and from Northern under its X–46. Southern Union was not a certificate holder.

In 1973 Southern Union encountered shortages in gas for its local users, and Western had trouble moving gas through sections of its lines for Southern Union's distribution to Beaver, Oklahoma. It appeared that as a result it might be necessary for Southern Union to cut off deliveries to its high priority customers in Beaver, a community of about 1,800 people. These were residential, commercial and irrigation customers.

The matter became critical and the local managers of Southern Union in the Oklahoma panhandle took it upon themselves to provide more gas to Beaver. This involved changes in the facilities for delivery of gas from Cities at what was known as the Adams Tap. This tap was to serve the Adams Irrigation System and gas was supplied there to Southern Union under the Rate Schedule IRG–1 referred to above. It was gas for irrigation pumps. This change was actually of interstate facilities at that point. A meter inspector of Cities was present when the change in the delivery facilities was made to increase delivery to Southern Union. Cities' management was aware

shortly thereafter as was Southern Union. The two then began negotiations to amend the existing contract (IRG–1) covering delivery at this point. The amendments were not accomplished and Cities continued to deliver under the old irrigation agreement. Southern Union distributed this added gas to its Beaver customers.

The local supervisors of Southern Union, as mentioned, did not advise their superiors before the change had been accomplished at the Adams Tap. The change was a violation of the Natural Gas Act as no prior authorization was obtained. Thereafter Southern Union filed with the Commission an application under 7(a) to have Cities deliver quantities of gas to Southern Union at the Adams Tap to regularize what was taking place. The Commission during the hearings and extended consideration of the case, issued a temporary authorization necessary for transportation of the gas to the Beaver distribution system.

The record demonstrates that the increased amount of gas delivered by Cities under the change at the Adams Tap was very small in comparison to the large volumes transported by Cities. It was an amount which was too small to be taken into consideration by Cities in the dispatchers' estimates. The testimony was that on a peak day during the shortages the total volume delivered for Southern Union at the Adams Tap was .12421 of one percent of Cities' volumes on such a day.

The Commission found that Southern Union's taking of gas at the Adams Tap for Beaver without prior Commission approval was a violation of the Natural Gas Act. The Commission referred the matter to the Department of Justice (without a recommendation). The Department advised the Commission that it would not institute any criminal proceedings. Such a reference is contemplated by the Act and appears to be the only remedy therein expressly provided.

In another attempt to meet the gas shortage for the priority users of the Beaver distribution system, Southern Union built a three and one-half mile connection between that system and its small irrigation distribution facilities known as the Balko Irrigation System. Balko was supplied by Northern Natural Gas Company. This connection was considered by Southern Union as part of its intrastate distribution, thus not within the Natural Gas Act (15 U.S.C. § 717(b)). No authority was sought from the Commission to build it. It also considered that it was taking this extra gas from Northern under the X–46 Rate Schedule which was in effect between them. Northern delivered under this schedule for the entire period. If deliveries exceeded the maximums under that contract there would be an exchange of gas or billing for the excess at the contract rate (X–46). The gas provided for Balko was done so originally and during the proceeding under irrigation schedules. These volumes received by Southern Union in 1976 were about .042 of one percent of Northern's sales. In 1976 the volumes so used to deliver to Beaver were 84,602 Mcf or about .01 percent of Northern's total volume. Southern Union's take for Beaver on a peak day (565 Mcf) was about .092 of one percent of Northern's peak day firm requirements.

The record contains no evidence of damages to customers of Northern or Cities by reason of the gas going to Beaver. The volumes were so small that they were not considered by the suppliers in their allocations. The Commission appears to have assumed that damages would have occurred. The extra gas however was purchased by Southern Union at irrigation rates and sold at the regular retail rates at Beaver.

In response to these connections or takes by Southern Union, which the Commission considered to be a violation of the Act, it sought to apply a remedy. The Attorney General had advised that his office was not going to act on the matter referred to it. It is the nature of this remedy which is at issue here as a question of the authority of the Commission under the Act.

As the remedy sought to be applied, the Commission in Opinions 120 and 120A directed that Cities Service and Northern Natural should collect from Southern Union for the past deliveries of the extra gas at

rates under what the Commission considered to be emergency rate schedules rather than under the rates applied by the parties to the transaction (IRG–1 and X–46). In compliance with the order Northern has billed Southern Union $419,284 for the past service for Beaver and Cities will apparently bill for about the same amount.

Thus the basic issue on appeal is whether this order of the Commission constitutes an assessment of a "penalty", is some form of "reparations" or to punish Southern Union in some way for misconduct. Also the issue arises as to whether the application of "emergency rates" is retroactive rate making in view of the question as to whether there were any such "emergency" rates in existence at the time in question.

The petitioner asserts that there were no emergency rate schedules then in effect between it and Cities or Northern. Thus the Commission has engaged in retroactive rate making. The petitioner also asserts that the order of the Commission by its terms and language itself demonstrates that a penalty is sought to be imposed or reparations ordered under the guise of rate making.

■ The Commission, on the other hand, urges that its order is proper as an administrative action taken pursuant to Section 16 of the Natural Gas Act. The Commission acknowledges that it has no authority to impose penalties nor to engage in retroactive rate making. The Commission cites *United Gas Company v. Callery Properties, Inc.*, 382 U.S. 223, 86 S.Ct. 360, 15 L.Ed.2d 284 (1965); *Gulf Oil Corp. v. F.P.C.*, 563 F.2d 588 (3d Cir.1977), *Mesa Petroleum Co. v. F.P.C.*, 441 F.2d 182 (5th Cir.1971), and *Niagara Mohawk Power Corp. v. F.P.C.*, 379 F.2d 153 (D.C.Cir.1967).

■ The Supreme Court has held that the Commission is not empowered to order that payments be made to one injured as damages. *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951). The Court has also ruled that the Commission cannot issue reparation orders. *F.P.C. v.*

*Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). *See Public Service Co. of New Hampshire v. F.E.R.C.*, 600 F.2d 944 (D.C.Cir.1979). As mentioned, the Commission acknowledges that these two prohibitions exist but in its brief it nevertheless recites that the orders under consideration were "to redress some of the injuries suffered by Cities' and Northern's customers due to the diversions" of the gas. There was no proof that damages or injuries were suffered, as above indicated, but the point here is that the Commission seeks to impose some sort of damage award. The Commission in its brief also states:

"In sum, to allow petitioner to escape any liability for its violations of the Natural Gas Act, would be plainly inequitable and contrary to the 'public interest', given the egregious nature of petitioner's illegal conduct in this case."

This is the acknowledged purpose of the order and it is a purpose or reason beyond the authority of the Commission. It would appear that Congress would have provided authority for civil penalties had it been intended for the Commission to have such power. There was no such authority originally and the DOE Act carried over the original powers only.

■ As mentioned above, the Commission relies on Section 16 of the Act to support the penalties ordered. This section in part says:

"The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." 52 Stat. 830 (1938); 15 U.S.C. § 717o.

This section does not relate to remedies but instead to the typical administrative-procedural rules to carry out the authority expressly given by Congress. There would seem to be no basis for a power to add civil remedies. We cannot agree that this administrative rule making power can serve as a basis for what is here a civil penalty. These cases urged by the Commission, and cited above, do not stand for a contrary

result in this case. These cases do uphold some considerable authority for the Commission to use Section 16 of the Act for what may be considered more than ordinary administrative-regulatory matters. But, again, we cannot agree that the section even so extended would authorize the penalties here imposed. Again, it is for Congress to provide civil penalties not for the Commission to create them.

It is understandable that the Commission has sought to apply some penalty or reparation against Southern Union. It considered the action at Balko and Adams as a gross violation of the Act and could not consider the fact that the action was taken to meet the needs of the small businesses and households at Beaver as that was not the question.

According to its brief the Commission was outraged that Southern Union might "escape liability," but the fact remains that the Supreme Court has decided that the Commission may not award damages nor order reparations. The Commission referred the matter to the Attorney General for possible criminal action and this was all that could properly be done.

Southern Union bought the gas from the suppliers at agreed upon rates—rates under existing irrigation tariffs, as mentioned. This was still agreed upon when the suppliers knew the reason why Southern Union wanted the extra gas. It was thus supplied under agreed upon conditions and over an extended time.

Aside from the matter of remedies, the Commission sought to arrive at a dollar figure it would use to have the certificate holders charge back against Southern Union. This figure, and to some extent the whole order, was sought to be based on "emergency rates" of Cities and of Northern which the Commission considered to be applicable. The Commission was unable to show that such rates existed. Rates for such a purpose would have required initially some agreement between the parties under the *Sierra-Mobile* doctrine. This was not shown and really no attempt was made to establish it. The only agreements for pur-

chase and sale were the ones existing at the time the takes were increased. There was no basis in the record to support the action of the Commission in creating retroactively a contractual relationship. The retroactive aspect of the case was aggravated by the period of time which elapsed between the order of the Commission setting the case for hearing upon the applications of Southern Union, and the date of order 120. This was a period of four and one-half years. During most of this time a temporary Commission order was in effect to permit Western to transport the gas in question at the Adams Tap to Beaver. The Commission gave no indication during this period that the Northern arrangement would be subject to attempted retroactive rate increases.

It must be concluded that the orders of the Commission here under review (No. 120, May 15, 1981, and the order denying rehearing, No. 120–A, July 15, 1981) are beyond the statutory authority of the Commission insofar as they seek to require Cities and Northern to collect from Southern Union additional amounts for the gas delivered at the Adams Tap or at the Balko Irrigation System. There is no legal basis in the record to support the portion of the order seeking to apply emergency rates retroactively.

The orders are set aside.

WILLIAM E. DOYLE, Circuit Judge, concurring in part and dissenting in part:

I concur generally but disagree with the final page [725 F.2d p. 103]:

I agree with the opinion insofar as it rules that the Commission lacks authority to assess penalties or reparations against companies guilty of misconduct under the Natural Gas Act. Montana-Dakota Utilities Co. and Hope Natural Gas Co.

No doubt the order is punitive and invalid.

There is, however, no injury to consumers to justify the order. Thus, there is no public interest served by the order and it is a penalty.

Whether the Commission may ever issue an order against offending oil companies requiring them to reimburse consumers or other companies to correct past violations is not being presented and need not be addressed.