777 F.2d 739
 250 U.S.App.D.C. 80
 PANHANDLE EASTERN PIPE LINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Indiana Gas Company, Inc., Central Illinois Light Company,
Associated Natural Gas Company, et al., Intervenors.
PANHANDLE EASTERN PIPE LINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Associated Natural Gas Company, et al., Michigan
Consolidated Gas Company, Michigan Gas Storage
Company, Indiana Gas Company, Inc., Intervenors.
 Nos. 84-1297, 84-1468.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 26, 1985.
Decided Nov. 22, 1985.
 
 Petition for Review of an Order of the Federal Energy Regulatory commission.
 Raymond N. Shibley, with whom Patrick J. Whittle was on brief for petitioner in Nos. 84-1297 and 84-1468.
 Joseph S. Davies, Attorney, Federal Energy Regulatory Commission, with whom William H. Satterfield, General Counsel, Jerome M. Feit, Solicitor, and Leslie J. Lowner, Attorney, Federal Energy Regulatory Commission were on the brief for respondent in Nos. 84-1297 and 84-1468. Barbara Weller, Attorney, Federal Energy Regulatory Commission, Washington, D.C., also entered an appearance for respondent in No. 84-1297.
 John R. Schaefgen, Jr., with whom Stephen L. Huntoon was on the brief for intervenor Associated Natural Gas Company, et al. in Nos. 84-1297 and 84-1468. Richard M. Merriman, Washington, D.C., also entered an appearance for intervenor Associated Nat. Gas Co., et al. in No. 84-1468.
 George A. Avery and Daniel L. Koffsky, Washington, D.C., were on brief for intervenor Michigan Gas Storage Co. in No. 84-1468.
 Jeffrey M. Petrash, Detroit, Mich., and James H. Holt, Washington, D.C., were on brief for intervenor Michigan Consolidated Gas Co. in No. 84-1468.
 J. Richard Tiano, Washington, D.C., Kenneth T. Rynne and Daniel W. McGill, Indianapolis, Ind., were on brief for intervenor Indiana Gas Co., Inc. in Nos. 84-1297 and 84-1468.
 Before J. SKELLY WRIGHT, MIKVA and GINSBURG, Circuit Judges.
 GINSBURG, Circuit Judge:
 
 
 1
 Two Federal Energy Regulatory Commission (Commission or FERC) orders are before us for review; both orders deny petitioner, Panhandle Eastern Pipe Line Company (Panhandle), recovery of carrying charges for unrecovered gas costs in its Account No. 191.[1] The two orders represent the Commission's attempt to halt the rapid growth of already enormous sums in petitioner's deferred account--sums that Panhandle expects some day to recover from future consumers. We hold that the first order was a reasonable response to a situation created primarily by Panhandle's own imprudence. We do not pass on the reasonableness of the second order, but instead remand that matter to the Commission for the statutorily required hearing.
 
 
 2
 The first order granted Panhandle's request to amortize its enormous deferred balance over thirty-nine months rather than the usual six allowed by regulation, but permitted Panhandle to recover only those carrying charges that would be recovered if the balance were amortized over twelve months. See Panhandle Eastern Pipe Line Co., 23 F.E.R.C. p 61,319, at 61,699-709 (May 31, 1983) (First Order ). FERC found that the build-up of the deferred account balance was ascribable primarily to Panhandle's imprudence; consequently, the Commission determined that a large portion of the requested carrying costs could not stand as "just and reasonable" charges under the Natural Gas Act (Act). See 15 U.S.C. Sec. 717c(a) (1982). We conclude that substantial evidence supports FERC's position. We further hold that the Commission's decision to disallow specifically twenty-seven months of interest was within the "zone of reasonableness."
 
 
 3
 The second order denied Panhandle recovery of all carrying charges on unrecovered gas costs for the months June-August 1983, on the ground that Panhandle had not lived up to its "representations" recorded in the First Order, that it would "reach or closely approximate" its targeted purchased gas price for those months. Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 61,252, at 61,564 (Feb. 28, 1984) (Second Order ). We vacate this order and remand the matter so that FERC may undertake the hearing required by statute before the Commission disallows rates on the basis of disputed factual issues. See 15 U.S.C. Sec. 717c(e) (1982).
 
 I. BACKGROUND
 
 4
 Under the Natural Gas Act, pipeline companies must file proposed "just and reasonable" rates with the Commission. They commonly do so in two ways. First, at least once every three years, pipelines must initiate a general rate proceeding under section 4 of the Act, 15 U.S.C. Sec. 717c (1982), to adjust their rates on the basis of a complete cost-of-service study. Second, because the price of gas may fluctuate widely over short periods, FERC also allows pipelines to adjust their rates at six month intervals to reflect recent changes in the price of gas without going through a full cost-of-service rate filing. These biannual filings are called purchased gas adjustments (PGAs). See 18 C.F.R. Sec. 154.38 (1985).[2]
 
 
 5
 The amount that a pipeline in fact pays for natural gas during each six month period may vary from the purchase price targeted in its PGA. When actual costs exceed estimated costs, the pipeline may place the costs that were not recovered from its customers in a deferred account, called Account No. 191, to be amortized as a surcharge to the pipeline's rates over the next six month period. Similarly, the pipeline may collect interest on the unamortized balance remaining in Account No. 191 by adding a surcharge to the rates filed in its next PGA. This interest to be recovered is called "carrying charges." See 18 C.F.R. Sec. 154.38(d)(4)(iv)(a)-(d) (1985).
 
 
 6
 This case involves two denials by FERC of requests for extraordinary carrying charges in extraordinary circumstances. As of November 1981, Panhandle had a negative balance in its Account No. 191. Beginning that fall, Panhandle decided to buy greater quantities of expensive Algerian gas from its wholly-owned subsidiary Trunkline Gas Company (Trunkline) and reduced its purchases of low cost gas; this purchasing pattern continued throughout the period in question.[3] Shortly thereafter, Panhandle's sales volume began steadily to drop. During the same period, Panhandle consistently under-recovered a substantial portion of its gas costs and deferred them for later recovery. The amount in its Account No. 191 climbed with startling rapidity: from a negative balance of 4.7 million dollars in November 1981 to a positive balance of 32.5 million in December of that year, to 189.1 million in June 1982, and to 269.8 million in November 1982.
 
 
 7
 Finally, this enormous balance gave rise to such an enormous surcharge that Panhandle's gas became unmarketable. In April 1983, Panhandle filed for an out-of-cycle PGA to reduce its prices.[4] It offered two bases for this proposed reduction. First, it requested permission to amortize its Account No. 191 balance, then 270.1 million dollars, over thirty-nine months rather than over the six month period prescribed by regulation. See 18 C.F.R. Sec. 154.38(d)(4)(iv)(d) (1983). Second, it estimated a decrease in gas costs for the remainder of the current PGA, June to August of 1983.
 
 
 8
 The Commission accepted the filing and allowed the proposed rates to go into effect on June 1 subject to two conditions. First, although FERC allowed Panhandle to amortize its balance over the requested thirty-nine months, the Commission limited carrying charges to the amount that would accrue if the balance were amortized over twelve months. See First Order, 23 F.E.R.C. at 61,700. Second, the Commission explained that its acceptance wasbased on the understanding that the company will reach or closely approximate the targeted purchased gas reductions reflected in the filing for the time period involved and that the filing is not simply a proposal to reduce the company's present rates to market more gas now while the company incurs significant undercollections in its Account No. 191 which would be passed on as increased rates in a subsequent time period.
 
 
 9
 Id. at 61,702. FERC then set for hearing the issue of the reasonableness of the rates.
 
 
 10
 After the hearing, the Administrative Law Judge (ALJ) found that the Commission's limitation of carrying charges to twelve months was appropriate because the huge Account No. 191 balance was attributable mainly to Panhandle's imprudent failure to change its format for estimating future gas costs. During the period in question, Panhandle's tariff required it to compute its estimated gas costs based on historical data from the previous year. This method could not reflect Panhandle's planned purchases of more expensive gas from its affiliate. If Panhandle had amended its tariff to require a projected method of estimation, using prospective data that fully reflected its decision to buy costly Algerian gas from Trunkline, its estimates would have been more accurate and its rates higher. As a result, Panhandle would have deferred smaller amounts and incurred smaller carrying charges. Upon finding that the large carrying charges were thus primarily attributable to Panhandle's imprudence, the ALJ concluded that the extraordinary charges were not "just and reasonable" costs to the consumers. See Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 63,058, at 65,256 (Feb. 16, 1984) (ALJ Decision ).[5] The Commission affirmed this decision and denied Panhandle's request for rehearing. See Panhandle Eastern Pipe Line Co., 27 F.E.R.C. p 61,345 (June 1, 1984) (June Order ). Panhandle then petitioned this court for review.
 
 
 11
 In the interim, Panhandle had continued to under-recover substantial amounts and to increase the balance in its Account No. 191. In January 1984, it filed its regularly scheduled PGA and included in the proposed rates a surcharge to reflect unrecovered gas costs and carrying charges on those sums for June, July, and August of 1983. The Commission accepted the filing but decided to "hold Panhandle to its prior representations" that it would "reach or closely approximate" its targeted price for June to August of 1983. Accordingly, FERC conditioned acceptance on, inter alia, Panhandle's removal from its rates of "all carrying charges relating to its unrecovered gas costs" for those three months. See Second Order, 26 F.E.R.C. at 61,564.
 
 
 12
 In response to this order, Panhandle filed a combined request for rehearing and compliance filing. It disputed the Commission's decision to disallow its carrying charges but agreed to comply because it interpreted the order to require removal of only the de minimis carrying charges that actually accrued during June, July, and August, rather than all carrying charges that would ever accrue on the unrecovered gas costs incurred during those months. The Commission then issued an "Order on Rehearing Modifying Prior Order," in which FERC observed that Panhandle had contested the Second Order but had "agreed to comply with" it. For that reason the Commission decided not to "respond to the arguments raised by Panhandle in this matter." Panhandle Eastern Pipe Line Co., 27 F.E.R.C. p 61,148, at 61,270 (April 27, 1984) (April Order ).
 
 
 13
 On March 29, 1984, Panhandle filed revised tariff sheets pursuant to the Second Order. The Commission issued public notice of the filings, and the General Service Consumer Group (GSC) filed a protest. GSC urged that the filing violated the Second Order because it removed only the de minimis charges that had accrued during June-August 1983, rather than all carrying charges that would ever accrue. The Commission then adopted the GSC's interpretation of its Second Order: on May 25, FERC accepted the revised tariff sheets subject to the condition that Panhandle remove all carrying charges for all the unrecovered gas costs incurred June-August 1983. See Panhandle Eastern Pipe Line Co., 27 F.E.R.C. p 61,314, at 61,582 (May 25, 1984) (May Order ). Panhandle filed a petition for review of this order. We consolidated the two petitions on September 27, 1984.
 
 II. THE FIRST ORDER
 
 14
 The parties differ at the outset over the correct legal standard to apply to the Commission's decision to allow Panhandle to recover only twelve months of interest on a balance spread over thirty-nine months. Panhandle argues that "it is fundamental that public utilities ... are entitled to recover their prudently incurred costs," including carrying charges. Brief of Petitioner at 32. The Commission contends, on the other hand, that when a company requests special relief, as Panhandle did here, the Commission has discretion to deny all or part of that relief and "there is no legal basis for this Court to require the Commission to do more." Brief for Respondent at 17. These positions are both too extreme.
 
 
 15
 Panhandle is in no sense "entitled" to the carrying charges at issue. The Fifth Amendment to the Constitution protects companies only from a rate so confiscatory as to be a taking, and Panhandle has not even asserted that such is the case here.[6] Nor do the applicable statute and regulations create the suggested entitlement. The Natural Gas Act does not discuss carrying costs at all; indeed, it was only in 1978 that the Commission passed a regulation to allow recovery of carrying charges. See Order No. 13, Modifications of Purchased Gas Cost Adjustments Clause Regulations [1977-1981 Transfer Binder] FERC Stats. and Regs., p 30,020 A, at 30,091-4 (October 27, 1978). Current regulations entitle Panhandle to recover just and reasonable[7] carrying charges only for a six month period,[8] but the First Order permits Panhandle to recover carrying charges for twice this minimum. Moreover, in a section 4 proceeding, such as this one, the pipeline bears the burden of proving that each element of relief requested is legitimate and a cost that ought to be passed on to the consumer. See Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120, 1128 (D.C.Cir.1979), cert. denied, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980).[9]
 
 
 16
 The Commission's discretion, however, is not unbounded even when it acts on petitions for special relief. FERC's findings must still be supported by substantial evidence, see Natural Gas Act Sec. 19(b), 15 U.S.C. Sec. 717r(b) (1982), and its action must be rationally related to its findings. See 5 U.S.C. Sec. 706(2)(A) (1982). We analyze each of these issues in turn.
 
 A. Substantial Evidence for Findings
 
 17
 In sustaining the twelve-month carrying charge limit, the ALJ found, and the Commission affirmed, that the extreme underrecovery was attributable primarily to Panhandle's imprudent failure to change its PGA format to a projected method "by the summer of 1982 at the latest" when it knew or should have known that the historic method it had been using was becoming increasingly less accurate due to changes Panhandle deliberately made in its purchasing pattern. ALJ Decision, 26 F.E.R.C. at 65,256; see June Order, 27 F.E.R.C. at 61,673. This finding, we are persuaded, is supported by substantial evidence.
 
 
 18
 Record evidence demonstrates that as early as September 1981, and continuously thereafter, Panhandle's actual purchased gas costs greatly exceeded its historical estimates. Shortly after September, its deferred account balance began to soar; by May 1982, the balance had reached $165.8 million, twice what it had been only three months earlier. ALJ Decision, 26 F.E.R.C. at 65,251. The record further shows that Panhandle could and should have anticipated these increased costs. It had decided as early as November 1981 to vary its purchasing pattern so as to buy a larger quantity of more expensive gas from its affiliate Trunkline. See June Order, 27 F.E.R.C. at 61,673 & n. 10. From March 1982 on, Panhandle also had information that it faced a decline in sales, which would cause further deferral unless reflected in its cost estimates. See ALJ Decision, 26 F.E.R.C. at 65,256. Panhandle does not contest this evidence, which fairly establishes its imprudence in not changing its PGA format.
 
 
 19
 Instead, Panhandle unavailingly disputes the significance of the finding that it should have changed its PGA format by the summer of 1982. First, it argues that it began discussions with the Commission to change its PGA format as early as September 1982--almost within the "mid-1982" deadline that the Commission held prudence dictated. But the fall of 1982 was too late merely to initiate such a change. The ALJ found that it was improvident not to have changed format by the summer of 1982 "at the latest," id.; similarly, the Commission set a deadline for the accomplished changeover of "at least [ ] mid-1982." June Order, 27 F.E.R.C. at p 61,345. The ALJ and FERC cast these dates as absolute limits for good reason: when Panhandle finally did file for a format change in September 1982, its Account No. 191 surcharge was already so high that consumers opposed the change because it would raise costs still higher. See June Order, 27 F.E.R.C. at 61,673. As a result, the proceeding dragged on until March 1984. See Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 61,342 (Mar. 19, 1984), on rehearing, 27 F.E.R.C. p 61,233 (May 10, 1984).
 
 
 20
 Second, Panhandle argues that even if it had filed for a format change in mid-1982, as the Commission indicated that prudence required, it still would not have recovered the 189 million dollars then in the Account No. 191. Brief of Petitioner at 42. In making this argument, Panhandle has again conspicuously misread the Commission's decision: the argument assumes that the Commission held only that Panhandle should have changed its PGA format during mid-1982 rather than by mid-1982 at the latest. See June Order, 27 F.E.R.C. at 61,673; ALJ Decision, 26 F.E.R.C. at 65,256. Panhandle could reasonably have anticipated a need for a change in its format at least as early as November 1981 when it altered its purchasing pattern. Had it done so, Panhandle might have deferred none of the 189 million dollars.
 
 
 21
 Finally, Panhandle argues that two Commission orders that mandated new operating procedures for Panhandle, and not its own imprudence, caused it to underrecover 66.6 million dollars during the period in question.[10] But the Commission conceded that "these factors contributed to the deferred account balance" and nonetheless found that "the primary cause of the huge balance was Panhandle's failure to change its PGA format." June Order, 27 F.E.R.C. at 61,673-74.[11] Even if we assume arguendo that the two orders contributed to Account No. 191 the full 66.6 million that Panhandle claims, Panhandle still has not carried its burden of proving that the carrying charges on the remaining 203.5 million dollars in the Account were costs that its customers should be required to bear. And, as we now show, see infra note 14 and accompanying text, the Commission's decision to disallow twenty-seven months of interest fell well within a "zone of reasonableness" bounded at the upper bracket with this figure of 203.5 million dollars in view.[12]
 
 B. Rational Basis for Action
 
 22
 Panhandle argues that the Commission's decision to disallow twenty-seven months of interest was arbitrary because the exact number bore no rational relationship to any explicit finding about the amount of unrecovered costs attributable to imprudence. We do not agree.
 
 
 23
 At the outset, we note that Panhandle's argument proceeds from the mistaken assumption that the agency's action in this order is in the nature of a penalty for past misconduct and so must bear an exact relationship to the degree of that misconduct. See Brief for Petitioner at 44-48. FERC has no authority to impose penalties. See Southern Union Gas Co. v. FERC, 725 F.2d 99, 102 (10th Cir.1984). While the Commission is not in the business of fitting the punishment to the crime, FERC does have large authority to take action necessary to promote the purposes of the Act, including fairness to the company, protection of consumers from unreasonable rates, and promotion of adequate and efficient service. See 15 U.S.C. Sec. 717c (1982). Considerations thus mixed are likely to generate, not an exact dollar figure, but a broad "zone of reasonableness" into which the Commission's rate decisions must fall. As a result, "the breadth of agency discretion is, if anything, at [its] zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of policies, remedies and sanctions ... in order to arrive at maximum effectuation of Congressional objectives." Columbia Gas Transmission Corp. v. FERC, 750 F.2d 105, 109 (D.C.Cir.1984) (quoting Niagara Mohawk Power Corp. v. FPC, 379 F.2d 153, 159 (D.C.Cir.1967)).
 
 
 24
 Our task in this case is therefore a confined one: "[C]ourts are without authority to set aside any rate adopted by the Commission which is within a 'zone of reasonableness.' " FERC v. Pennzoil Producing Co., 439 U.S. 508, 517, 99 S.Ct. 765, 771, 58 L.Ed.2d 773 (1979). In this area, "if the Commission's order 'produces no arbitrary result' our inquiry is at an end." Public Systems v. FERC, 709 F.2d 73, 79 (D.C.Cir.) (quoting FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942)). Although the Commission's order was somewhat inartfully drawn, we can without substantial difficulty reconstruct the reasoning by which the agency derived its zone of reasonableness in this case, and we can determine that the exact number FERC chose fell comfortably within that zone. See, e.g., National Association of Broadcasters v. Copyright Royalty Tribunal, 772 F.2d 922 (D.C.Cir.1985) (upholding royalty rate as within zone of reasonableness derivable from agency's explanation); Recording Industry Association of America v. Copyright Royalty Tribunal, 662 F.2d 1, 10 (D.C.Cir.1981) (same).
 
 
 25
 The Commission explicitly recognized its statutory responsibility to balance the interests of consumers and pipelines. See June Order, 27 F.E.R.C. at 61,674. It further observed that in this balance, Panhandle had no right to recover imprudently incurred costs. As we have shown, FERC reasonably found Panhandle's failure to change its PGA format to be imprudent and "the primary cause" of the huge deferred balance. Id. (emphasis added). In other words, Panhandle's customers could not be required to pay--and so Panhandle could not recover--more than half of the proposed carrying charges, or 19 1/2 months worth. The Commission thus indicated with sufficient clarity that the lower bracket of its zone of reasonableness was a disallowance of 19 1/2 months of carrying charges.
 
 
 26
 The Commission also recognized that other "factors"--the Btu and subaccounting orders, see supra note 10--contributed to the deferred account balance. Id. FERC did not indicate exactly how much it believed these orders contributed, apparently because it considered that even if it attributed to them the full amount Panhandle suggested, the number it had selected would still be reasonable.[13] The Commission was correct in this judgment: even if we attributed to the Commission's orders the full amount of 66.6 million dollars, we could derive an upper bracket for the zone of reasonableness of about twenty-nine months of disallowed carrying charges.[14]
 
 
 27
 The Commission thus explained the derivation of its zone of reasonableness with adequate clarity. The exact number FERC picked--twenty-seven months--falls well within this zone. The Commission's "path" in this case "may reasonably be discerned." Bowman Transportation, Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). We therefore uphold as rationally related to the Commission's fully-substantiated findings FERC's comprehensible attempt to stem the flood of Panhandle's rising surcharge.
 
 III. THE SECOND ORDER
 
 28
 This attempt to stem the flood, however, did not succeed; Panhandle continued to defer costs. As a result, the Commission issued its Second Order denying Panhandle all carrying charges on unrecovered gas costs for June-August 1983. The parties ask us to decide two issues with regard to this order. First, FERC has moved to dismiss the petition for review as untimely. Panhandle disagrees and further argues that the Commission failed to give Panhandle the hearing required by statute before issuing the Second Order. We conclude that the petition was timely filed, therefore we do not lack jurisdiction over the case; we further hold that the Commission must accord Panhandle a hearing before ruling on the June-August 1983 carrying charges.
 
 A. Jurisdiction
 
 29
 Panhandle filed its petition for review before this court on July 10, 1984. FERC argues that this petition was untimely because it was not brought within sixty days of the April Order, the Commission's decision on Panhandle's request for rehearing of the Second Order. Alternatively, the Commission argues that if we regard the petition as one to review the May Order, the petition is premature because Panhandle has not yet filed a petition for rehearing before the agency. See 15 U.S.C. Sec. 717r(a), (b) (1982).
 
 
 30
 This set of arguments overlooks the fact that FERC, in its April Order, appeared to accept Panhandle's "de minimis " interpretation of the Second Order. The Second Order clearly disallowed all "carrying charges on [the June-August 1983] unrecovered gas costs in future filings." As the Commission now suggests, Panhandle's "de minimis " interpretation in its request for rehearing--its reading of FERC's Second Order to disallow only those carrying charges that accrued during June to August of 1983--was implausible in the extreme, at best an indulgence in wishful thinking. Unaccountably, however, the Commission itself appeared to acquiesce in Panhandle's remarkable interpretation; in its April Order, FERC observed that "Panhandle has agreed to comply with the [Second Order]." April Order at 61,270.
 
 
 31
 Panhandle thus had no reason to petition this court for review until the Commission's May Order informed it that FERC would indeed disallow all carrying charges on the amounts in question. In view of these strange circumstances, we are impelled to regard the date of the May Order as the date on which the Commission finally ruled on Panhandle's request for rehearing, and therefore the date on which the filing period began. The petition for review was filed within sixty days of that date.
 
 
 32
 We likewise cannot accept the argument that the petition is premature because Panhandle has not yet filed a request for rehearing on the May Order. The May Order was in substance the conclusive decision on rehearing of the Second Order, not a new directive, and thus does not itself necessitate a petition for rehearing before the Commission. We note in this regard that the purpose of the statutory exhaustion doctrine "is to afford the Commission the first opportunity to consider, and perhaps dissipate, issues which are headed for the courts"; "irregularities" which do not impair that purpose do not affect our authority to review actions of the Commission. Public Service Comm'n v. FPC, 543 F.2d 757, 774 n. 116 (D.C.Cir.1974). The Commission already has had two opportunities--the April and May Orders --to address the issue Panhandle now brings to court. The irregularities in this case therefore do not block our review.
 
 
 33
 In sum, the purposes of the timeliness and exhaustion doctrines have been satisfied in this case. Panhandle was not dilatory in seeking review, once the Commission provided a conclusive decision on rehearing. Nor has the Commission been denied ample opportunity to consider the issue to which we now turn: whether and how the Commission could deny Panhandle all carrying charges on the unrecovered gas costs for June-August 1983.
 
 B. The Hearing Requirement
 
 34
 Section 4(e) of the Natural Gas Act obliges the Commission to hold a hearing before disallowing cost components of proposed rates. See 15 U.S.C. Sec. 717c(e) (1982); United Gas Pipe Line Co. v. FPC, 551 F.2d 460, 463 (D.C.Cir.1977). FERC's Second Order disallowed Panhandle's proposed carrying costs without a hearing and therefore violates the Natural Gas Act.
 
 
 35
 The Commission points to an exception: a hearing is unnecessary in cases "where the facts are not in dispute and the new tariff contravenes valid and explicit [agency] regulations or policy." United Gas Pipe Line Co. v. FPC, 551 F.2d at 463 (citing FPC v. Texaco, Inc., 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964)). FERC argues that this exception applies to the Second Order because a critical fact not in dispute--i.e., that Panhandle had not met or closely approximated its projected costs for June-August 1983--showed that the new tariff contravened a valid and express policy stated in the First Order--i.e., that the Commission would disallow all unrecovered gas costs for the period in question.
 
 
 36
 This argument inserts more into the First Order than we can find in the Commission's statement. We read the order to indicate that FERC will strictly disallow all imprudently incurred costs, not that it will disallow all carrying charges on unrecovered costs, regardless of the cause. Specifically, the order explained:
 
 
 37
 The Commission's acceptance of the subject filing is based on the understanding that the company will reach or closely approximate the targeted purchased gas price reductions reflected in the filing for the time period involved and that the filing is not simply a proposal to reduce the company's present rates to market more gas now while the company incurs significant undercollections in its Account No. 191 which would be passed on as increased rates in a subsequent time period.
 
 
 38
 First Order at 61,702.
 
 
 39
 The Commission phrased its basis of acceptance not as a condition but as an "understanding"--suggesting no more than Panhandle's recognition of pre-existing obligations to incur only prudent costs. Similarly, the Commission understood only that Panhandle would "reach or closely approximate " its estimates, indicating FERC's recognition of the inevitability of price fluctuation and the need for flexibility. Id. (emphasis added). Finally, FERC contrasted its "understanding" of Panhandle's behavior with a hypothetical bad-faith motive for the filing: Panhandle's desire to market more gas now, at the expense of future consumers. The order thus reflects a concern that Panhandle should incur deferred costs only in good faith and with prudence, not that Panhandle should incur no deferred costs or almost none, regardless of circumstances.[15]
 
 
 40
 We therefore remand this second order to the Commission for a hearing under section 4 of the Natural Gas Act, 15 U.S.C. Sec. 717c (1982), to resolve the contested factual issues of whether Panhandle was imprudent in deferring costs from the period June-August 1983, and how much of the deferral was caused by imprudence.
 
 IV. CONCLUSION
 
 41
 We are conscious of the difficulty that the Commission faces in attempting to carry out its statutory mission when a regulated company, such as Panhandle, consistently resists the agency's effort. At times, the Commission must take determined action to stop conduct certain to injure a group of consumers who are as yet unidentified and cannot speak for themselves. The Commission took such action in its First Order under review in this case. We further appreciate that the mix of factors which the Commission must consider and balance may yield not a precise prescription but instead, a rather wide "zone of reasonableness" into which the Commission's chosen course must fall. When the Commission's decision does fall within this zone and the Commission has sufficiently indicated its reasons for believing so, we will uphold the agency action, as we do here.
 
 
 42
 Even when faced with a course of conduct such as Panhandle's, however, the Commission may not deny the procedures required by the Natural Gas Act. We intimate no opinion on how FERC should rule on the specific contested factual issues of whether Panhandle was imprudent and the role of that imprudence in the deferral of costs from the period June to August 1983. But however the Commission rules, section 4 of the Act, 15 U.S.C. Sec. 717c(e) (1982), directs that FERC first must accord Panhandle a hearing.
 
 
 43
 The First Order, Panhandle Eastern Pipe Line Co., 23 F.E.R.C. p 61,319 (May 31, 1983), is therefore affirmed. The Second Order, Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 61,252 (Feb. 28, 1984), is vacated and the matter is remanded for proceedings consistent with this opinion.
 
 
 44
 It is so ordered.
 
 
 45
 J. SKELLY WRIGHT, Circuit Judge, concurring:
 
 
 46
 While I join the court's opinion, I write separately to express reservations about Part II. I join Part II, however, because I recognize the Commission's authority to limit the recovery of carrying charges to 12 months. But I emphasize my belief that the court in this case stretches the limit of what it means to "reasonably discern" an agency's "path."
 
 
 47
 For all our efforts in attempting to narrow the "zone of reasonableness" that is faintly implicit in the Commission's actions, it still extends from $135 million to $204 million--a considerable difference, even as a percentage of the total. The precise figure the Commission chooses from this zone determines how the carrying charges will be divided between ratepayers and stockholders. The agency may divide the carrying charges on this sum in the way that best effects the goals of the Natural Gas Act, but it may not do so arbitrarily, even within the "zone of reasonableness."
 
 
 48
 One of our protections against arbitrariness is the requirement of a reasoned explanation by the Commission. This explanation allows ratepayers, shareholders, and the public to see how their relative interests have been balanced. It also enables similarly situated pipelines to compare their treatment to Panhandle's to insure that any differences are rational. The court has looked harder in this case to discern a rational path than it is obliged to do; the Commission should not depend on the court to supply its reasoning.
 
 
 
 [1]
 Amounts paid for gas in excess of the estimated gas cost included in the pipeline's rate are credited to this account
 
 
 [2]
 PGAs are also technically section 4 proceedings because the Commission created them pursuant to its ratemaking authority under that section. See 15 U.S.C. Sec. 717c (1982)
 
 
 [3]
 All issues regarding these gas purchase practices have been settled, and the Commission has approved the settlement. See Panhandle Eastern Pipe Line Co., 26 F.E.R.C. p 61,342 (Mar. 19, 1984), on rehearing, 27 F.E.R.C. p 61,233 (May 10, 1984)
 
 
 [4]
 Each company's tariff specifies the dates on which it should file its biannual PGA. An out-of-cycle PGA is one filed between these dates
 
 
 [5]
 The Administrative Law Judge (ALJ) also found that Panhandle's customers would not benefit from the extension of carrying charges for the full thirty-nine months. She therefore rejected Panhandle's equitable argument that such an extension would be in the best interests of both Panhandle and its consumers. See ALJ Decision, 26 F.E.R.C. at 65,256-57. The Commission correctly concluded that Panhandle had failed to carry its burden of proof by submitting a valid study to the contrary "when it had a full opportunity to do so during the hearing." Panhandle Eastern Pipe Line Co., 27 F.E.R.C. p 61,345, at 61,674 (June 1, 1984)
 
 
 [6]
 See FERC v. Pennzoil Producing Co., 439 U.S. 508, 519, 99 S.Ct. 765, 772, 58 L.Ed.2d 773 (1979). Nor could the petitioner argue that deviation from cost-based ratemaking as such is a violation of the takings clause. It is within the Commission's constitutional and statutory authority to deny recovery even for some prudently incurred costs. Id
 
 
 [7]
 See, e.g., West Ohio Gas Co. v. Public Utilities Commission of Ohio, 294 U.S. 63, 68, 55 S.Ct. 316, 319, 79 L.Ed. 761 (1935) ("A public utility will not be permitted to include negligent or wasteful losses among its operating charges."); NEPCO Municipal Rate Committee v. FERC, 668 F.2d 1327, 1333 (D.C.Cir.1981), cert. denied, 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329 (1982)
 
 
 [8]
 See 18 C.F.R. Sec. 154.38(d)(4)(iv)(c), (d) (1985). Panhandle's tariff filed with the Commission also authorizes only a six month amortization period and carrying charges for such a period. See Panhandle Eastern Pipe Line Company FERC Gas Tariff (Effective: September 10, 1982), Joint Appendix at 150-51
 
 
 [9]
 The burden does not shift to the Commission unless and until it institutes a change in a ratemaking component that does not constitute at least a partial acceptance of the change proposed by the company. See Public Service Comm'n v. FERC, 642 F.2d 1335, 1345 (D.C.Cir.1980), cert. denied, 454 U.S. 879, 880, 102 S.Ct. 360, 362, 70 L.Ed.2d 189 (1981)
 
 
 [10]
 Specifically, Panhandle argues that Panhandle Eastern Pipe Line Co., 18 F.E.R.C. p 61,187 (Feb. 26, 1982), which required Panhandle to employ various new sub-accounts in its accounting method, caused 44 million dollars of deferred costs; and that Final Rules for Part 270, Subpart B, Sections 270.201, 270.202, and 270.204, 12 F.E.R.C. p 61,045 (July 16, 1980), and 15 F.E.R.C. p 61,075 (April 24, 1981), which mandated a change from the "wet" to the "dry" method of measuring the number of Btus of natural gas, caused 22.6 million dollars of deferred costs
 
 
 [11]
 Similarly, the ALJ found that the huge deferred balance arose "mainly" because of Panhandle's failure to change its format, "notwithstanding the impact of ... the Commission's regulations" on subaccounting and gas measurement. ALJ Decision, 26 F.E.R.C. at 65,256
 
 
 [12]
 Panhandle's other objections to the Commission's finding do not warrant extended discussion. First, Panhandle argues that the "prudence" standard used by the Commission in this case is too vague to provide guidance to Panhandle. The only authority Panhandle cites for this proposition, Consumer Federation of America v. FPC, 515 F.2d 347 (D.C.Cir.), cert. denied, 423 U.S. 906, 96 S.Ct. 208, 46 L.Ed.2d 136 (1975), held that the standard should be clear, not to give notice to the company but to provide assurance to the courts that rates are just and reasonable. To the extent that Panhandle is arguing that the vagueness is so great as to cause lack of notice and so to constitute retroactive rulemaking, we reject the argument. Panhandle argued for inclusion of the costs at issue in the PGA on the ground that they were necessary and appropriate to service; the Commission rejected them on the ground that they were not. Panhandle was on plain notice that only such costs could be passed on to consumers
 Second, Panhandle argues that if it had prudently filed estimated costs based on a projected format it would have violated its legally binding tariff, which required an historic PGA format. The Commission did not hold Panhandle accountable for failing unilaterally to violate its tariff. Instead, FERC reasoned that prudence required Panhandle to seek prompt leave to amend its tariff to incorporate an historic method.
 
 
 [13]
 Specifically, the Commission observed that "the [ALJ] properly considered the impact" of the orders in question. June Order, 27 F.E.R.C. at 61,674. The ALJ had found that the account balance was attributable "mainly" to Panhandle's imprudence, "notwithstanding" the "impact" of the two orders. ALJ Decision, 26 F.E.R.C. at 65,256. At no point did the ALJ indicate that the impact of the orders was other than as Panhandle alleged--66.6 million dollars in deferred costs. The Commission's opinion did note that the impact of the orders may have been less than Panhandle claimed, June Order at 61,674, but it is clear that the Commission did not believe the reasonableness of the number it had chosen depended upon such a determination
 
 
 [14]
 Panhandle attributes 66.6 million of the balance to the Btu and subaccounting orders, or about one-quarter of the total 270.1 million that it asked to amortize over thirty-nine months. Thus, three-quarters of the balance is not attributable to these orders. Twenty-nine months worth of interest is approximately three-quarters of the total carrying charges on the unamortized balance carried over thirty-nine months
 
 
 [15]
 Our reading of the order is bolstered by our conclusion that if the Commission's interpretation of the First Order were correct, the order would be arbitrary and capricious. The Commission's own regulations guaranteed to Panhandle recovery of six months of prudently incurred carrying charges. See supra note 8 and accompanying text; 18 C.F.R. Sec. 154.38(d)(4)(iv)(c), (d) (1983). The Commission's present interpretation of the order would deny Panhandle recovery of these charges in violation of the familiar rule that an agency must follow its own regulations. See Panhandle Eastern Pipe Line Co. v. FERC, 613 F.2d 1120, 1135 (D.C.Cir.1979), cert. denied, 449 U.S. 889, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). The Commission argues, however, that the absolute requirement that Panhandle meet its estimates is simply a "condition" on the grant of special relief, which the Commission could deny altogether. But this characterization is inaccurate: calling the requirement a condition implies that Panhandle freely undertook this burden in exchange for the benefits of a longer amortization period. In fact, Panhandle had no such choice open to it; once Panhandle had made its request, the Commission issued its order without consulting Panhandle further on the issue