**SHELL OIL COMPANY, Petitioner,**

v.

**FEDERAL POWER COMMISSION, Respondent.**

**Texas Gas Transmission Corporation and Louisville Gas & Electric Company, Intervenor-Respondents.**

**No. 12568.**

United States Court of Appeals Third Circuit.

Argued April 18, 1961.

Decided June 15, 1961.

11. The Maryland Court of Appeals was paraphrasing a statement in Hayman v. Morris, Sup.1942, 37 N.Y.S.2d 884, 891.

Oliver L. Stone, New York City (William F. Kenney, New York City, George C. Schoenberger, Jr., William W. Westerfield, Jr., New Orleans, La., on the brief), for petitioner.

Howard E. Wahrenbrock, Washington, D. C. (John C. Mason, Gen. Counsel, Luke R. Lamb, Asst. Gen. Counsel, Milton J. Grossman, Atty., Washington, D. C., on the brief), for respondent Federal Power Commission. Mathias F. Correa, New York City (Arthur L. Corbin, New Haven, Conn., Charles F. Detmar, Jr., Lawrence W. Keepnews, Cahill, Gordon, Reindel & Ohl, New York City, Gavin H. Cochran, Louisville, Ky., on the brief), for intervenors.

Before GOODRICH, McLAUGHLIN and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The Supreme Court upheld our jurisdiction to determine the question of the proper interpretation to be given the "favored nation" clause of the 1951 contract between petitioner and Texas Gas in dispute here. It disagreed with our construction of the agreement, holding that the clause does not effect an increase in price by reason of the February 17, 1954 Texas Gas agreement with Atlantic.[1] The case was therefore reversed and remanded to us for decision first, whether the enforceability issue is material and second, if it is, to pass upon its merits.

■ The answer to our first inquiry is simply arrived at. We had assumed without deciding that the basic 1943 contract between Atlantic and the predecessor of Texas Gas was enforceable and held that the 1954 agreement was a separate contract.[2] The Supreme Court, necessarily under the same assumption, viewed the 1954 transaction as merely a price adjustment within the 1943 agreement. If a price agreement for the third 1943 contract period was not enforceable under that contract when the second one expired on August 31, 1953, the February 1954 agreement between Atlantic and Texas Gas brought into play the Shell-Texas Gas raise in price clause. Such conclusion would of course not be in conflict with the referred to opinion of the Supreme Court. It follows that the question of whether the 1943 contract was enforceable with respect to the 1954 price agreement, is most material.[3]

■ Petitioner contends that the 1943 contract between Atlantic Refinery Co. and Louisiana, as successor to Defense Plant Corporation, was severable and by itself, not controlling beyond its first five year period. For that time the agreed price for gas received by the buyer was 2.2¢ per Mcf. The below quoted language from Paragraph 3 dealt with the prices for the balance of the twenty-five year contract:

"(b) At the end of the first five-year period, Buyer and Seller are to reach an agreement as to the price for gas sold and delivered under this contract during the second five-year period. The price to be paid during such second five-year period is to be agreed upon at the beginning of such period after a survey of prevailing prices for gas being sold in similar quantities in the southwestern part of Louisiana.

Atlantic is the type contract specifically noted in its 1951 agreement with Texas Gas which would activate the escalator clause of that obligation. Its contention forces examination of the 1943 document. Should that examination reveal that the agreement does not legally control the determination of the price of the contract gas for the third five year period, Shell receives the strongest possible support in its construction of the 1954 contract.

1. Texas Gas Transmission Corp. v. Shell Oil Co., 1960, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208.

2. Shell Oil Co. v. Federal Power Commission, 3 Cir., 1959, 263 F.2d 223.

3. It is argued that the issue is not material because Atlantic and Texas Gas treated the 1943 contract as binding and that it is not for Shell, a stranger to the contract, to say it was not legally enforceable. Shell's position is that the 1954 agreement between Texas Gas and

"(c) During succeeding five-year periods, prices to be paid will be determined at the beginning of each period in the same manner as provided for in paragraph (b) above.

"(d) In the event that the parties are unable to agree upon the price to be paid for gas after the first five-year period, in accordance with the arrangements set forth in paragraphs (b) and (c) above, such determination shall be submitted to arbitration in accordance with Condition XII."

The pertinent arbitration provisions of Condition XII read:

"XII. * * * The party desiring such arbitration shall notify the other and in such notice shall name an arbitrator, the arbitrator to be appointed by the other party shall be named within ten (10) days after receipt of such notice of arbitration, and an additional arbitrator shall, within ten (10) days of the appointment of the second arbitrator, be selected by the two (2) arbitrators theretofore appointed, but if one of said parties shall have failed to appoint an arbitrator within the time provided herein, it is expressly understood and agreed that the sole arbitrator shall arbitrate the question alone. If arbitrators shall have been appointed by the respective parties and shall have failed to select the third arbitrator within the above stated time, the third arbitrator shall be appointed by the senior Judge of the 5th Federal Judicial Circuit upon application therefor by either of said parties to the arbitration.

" * * * The decision in writing signed by a majority of the arbitrators shall be final and conclusive with respect to the matter submitted and the parties hereto agree to accept and abide by the same. * * * "

For our purposes the facts regarding the 1943 contract can be briefly stated. As to the gas price for the second five year period, the parties, in October 1948, first agreed to a price covering the six months from September 1, 1948 to March 1, 1949, providing that at the end of that time they " * * * will negotiate, in accordance with paragraph III b and d, the price to be paid for gas delivered during the remaining four years and six months of the second five year period as provided in the contract." On February 16, 1949, the parties by written contract stated " * * * it is desired by the parties hereto that a new agreement be reached as to the price to be effective during the remainder of the second five year period of the contract." And further said " * * * that for the period beginning March 1, 1949 and ending August 31, 1953, the price of gas shall be five cents (5¢) net per one thousand (1,000) cubic feet of gas received * * *."

With the beginning of the third five years at hand Texas wrote Atlantic saying that " * * * The price provisions * * * expire on August 31, 1953" and " * * * You are hereby notified of our willingness to commence negotiations with you concerning such price * * *." Those negotiations commenced the following month and were concluded by a contract entered into on February 17, 1954. This fixed the gas price of 12.2¢ per Mcf as of September 1, 1953 and extending to August 31, 1958. It is this agreement that petitioner urges triggered the escalation clause of its contract with Texas Gas. At that time petitioner was receiving 8.997¢ per Mcf.

The Presiding Examiner agreed with Shell. Deciding we had jurisdiction to construe Shell's contract, we held that its "favored nation" provision was activated by the February 17, 1954 agreement between Atlantic and Texas Gas. As stated, we assumed without deciding that the Atlantic-Louisiana 1943 commitment imposed "a binding agreement to agree on the price of gas in each of the contract's last four five year periods." Certiorari was granted on the question of jurisdiction. That point was upheld but the Supreme Court as to the con-

struction of the 1943 agreement (which question was within the scope of the petition for certiorari) concluded that the 1954 Atlantic-Texas Gas contract did not bring into being the escalator provision of the Shell-Texas Gas covenant.

Our primary responsibility on remand is to determine whether with respect to its third five year term, the 1943 contract between Atlantic and Texas Gas was enforceable. The answer to this lies in the pact's arbitration clause. Under that the certainty of arbitration is properly conceded by Shell. Its concession however goes no further. And it argues determinedly and forcefully that the arbitration might never have resulted in an accepted price. If this is so Shell's contention is correct.

We are. dealing with a full dress instrument. Its twenty five year continuity is clearly expressed. Its intent to have binding prices for the indicated gas throughout its term is evident. It could have been and should have been tighter in that regard but we do not consider it so loose as to defeat the mandatory establishment of prices under it for all its segments. Purpose of the parties alone is not enough but starting with that, as we must, the 1943 instrument, correctly interpreted, will produce a fixed price for its 1953–1958 portion.

The problem in the first instance is not one of specific performance. No need worrying about that if no price certain is ascertainable. Assuming no price accord between the parties on the period before us either one of them under Condition XII by notice to the other can name an arbitrator. The second party within ten days after that is empowered to select a second arbitrator. Within a second ten days, a third arbitrator, chosen by the first two is provided for. If either party fails to designate an arbitrator, the one chosen "shall arbitrate the question alone." If two arbitrators have been appointed and they do not agree on a third, the latter " * * * shall be appointed by the senior Judge of the 5th Federal Judicial Circuit upon application by either of said parties to the arbitration." Condition XII concludes by stating " * * * The decision in writing signed by a majority of the arbitrators shall be final and conclusive with respect to the matter submitted and the parties hereto agree to accept and abide by the same  *  *  *."

It seems to us that the above language is meaningful. By it the parties accept a definite standard under which the gas. price will be established directly within the contract area. The intent is plainly that if arbitration be necessary to arrive at a price the prescribed method will produce the contemplated price. And the mechanics of the stated procedure follow through acceptably to that end. We cannot say that, given the elaborate structure and purpose of this long term agreement, Condition XII can be fairly construed to be so maladroit that its language justifies a reasonable view that the arbitration established by it will so misfunction as to be unable or unwilling to arrive at a price.[4]

Nor can we agree that the flexible pricing arrangement of the contract makes it severable to the degree that it does not come into effect with respect to the periods beyond the first until the actual price for each has been determined. The motivation behind the periodic price adjustments is recognition of the probabilities of normal price variation in gas during the long duration of the contract. The principle makes sense against any contrary view that might be urged. Particularly is it desirable as compared to an attempt to state rigid price figures for the whole future twenty five year operation. It is true that certain stand-

4. We find no substance to the proposition that because the parties, at the conclusion of the second five year period, directly negotiated between themselves the gas price figure for the third year it would have been too late under the contract for them to have then turned to arbitration. It seems to us that negotiations, even if protracted, are plainly the contract intendment. The arbitration machinery is set up for use should such negotiations prove unsuccessful.

ards for the calculation of the interval prices could have been and might well have been named. Absent these there is present the definite procedure and obligation to accede to it by which the needed prices are to be fixed.

Much is said in the case on the question of whether Louisiana law governs enforceability of the contract but under our conception of the controverted document, Louisiana law, in this instance at least, does not differ from general contract doctrine. Therefore, abstract discussion of whether Louisiana law controls the enforceability of the Atlantic pact is not called for. Circumstances considered, the Atlantic-Texas Gas agreement does contain a valid, workable price-fixing standard. We would be ignoring this and descend to quibbling were we to hold otherwise.

The order of the Commission will be affirmed.