377 U.S. 33 (1964)
FEDERAL POWER COMMISSION
v.
TEXACO INC. ET AL.
No. 386.
Supreme Court of United States.
Argued March 25, 1964.
Decided April 20, 1964.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT.
*34 Howard E. Wahrenbrock argued the cause for petitioner. With him on the brief were Solicitor General Cox, Ralph S. Spritzer, Richard A. Solomon, Josephine H. Klein and Peter H. Schiff.
Alfred C. DeCrane, Jr. argued the cause for respondent Texaco Inc. With him on the brief was Paul F. Schlicher. Carroll L. Gilliam argued the cause for respondent Pan American Petroleum Corp. With him on the brief were W. W. Heard, Wm. H. Emerson and William J. Grove.
J. Calvin Simpson and John T. Murphy filed a brief for the State of California and the Public Utilities Commission of California, as amici curiae, urging reversal.
MR. JUSTICE DOUGLAS delivered the opinion of the Court.
The Federal Power Commission in its regulation of independent producers[1] of natural gas has required them *35 to file their contracts as rate schedules. This was done by regulations which evolved as a result of a series of rule-making proceedings.[2] The pertinent regulations presently provide that only certain pricing provisions in the contracts of independent producers are "permissible,"[3] any other being "inoperative and of no effect at law."[4] The regulations go on to say that any contract executed on or after April 2, 1962, containing price-changing provisions other than the "permissible" ones, "shall be rejected" so far as producer rates are concerned,[5] that a producer's application for a certificate of public convenience and necessity under § 7 of the Natural Gas Act "shall be rejected" if any contract submitted in support of it contains any of the forbidden provisions,[6] and that, so far as pipeline certificates are concerned, any producer contract executed after that date which has that *36 infirmity "will be given no consideration in determining adequacy" of a pipeline company's gas supply.[7]
These regulations were adopted pursuant to the provisions of § 4 of the Administrative Procedure Act, 60 Stat. 238, 5 U. S. C. § 1003. General notice of the proposed rule making was published in the Federal Register as required by § 4 (a) of that Act. The Commission also gave interested parties a "hearing" under § 4 (b).[8] No oral argument was had but an opportunity was afforded for all interested parties to submit their views in writing; and the two respondents in this caseTexaco and Pan American along with others, did so.
Later, each respondent submitted an application for a certificate of public convenience and necessity under § 7 of the Natural Gas Act, to supply natural gas to a pipeline company. Section 7 provides, with exceptions not presently material, that the Commission "shall set" such an application "for hearing." Since, however, the applications disclosed price clauses that are not "permissible" under the regulations,[9] the Commission without a hearing *37 rejected the applications. 28 F. P. C. 551; 29 F. P. C. 378. Petitions for review were filed with the Court of Appeals, which set aside the orders of the Commission. 317 F. 2d 796. It held that while the regulations are valid as a statement of Commission policy, they cannot be used to deprive an applicant of the statutory hearing granted those who seek certificates of public convenience and necessity. The two cases are here in one petition for certiorari which we granted because of an apparent conflict between that decision and Superior Oil Co. v. Federal Power Comm'n, 322 F. 2d 601, decided by the Court of Appeals for the Ninth Circuit. 375 U. S. 902.

I.
A preliminary question, which concerns Texaco Inc., alone, is whether venue to review these orders of the Commission was properly in the Tenth Circuit. The governing provision is § 19 (b) of the Natural Gas Act which provides:
"Any party to a proceeding under this Act aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia . . . ."
The term "is located" would have an ambivalent meaning if venue lay only in "any circuit" where the natural gas company "is located." But in the context of § 19 (b) "any circuit" covers either the place where the company *38 "is located" or where it "has its principal place of business." Hence the main argument of Texaco derives from the fact that "is located" was substituted for "resides" in an early draft of the bill[10] which later emerged as the Federal Power Act, from which § 19 (b) of the Natural Gas Act is derived. The Court of Appeals found that change decisive; but we can only conjecture as to why it was made, as no explanation appears. The bill in which "resides" was used gave review to "any person aggrieved" and the bill substituting "is located" for "resides" substituted "licensee or public utility" for "person aggrieved." Since the latter language was changed from the personal to the impersonal it may be, as the Commission says, that the Congress was trying to use common legal parlance that a corporation "can have its legal home only at the place where it is located by or under the authority of its charter," as stated in Ex parte Schollenberger, 96 U. S. 369, 377. And see Neirbo Co. v. Bethlehem Corp., 308 U. S. 165, 169. However that may be, we think that "is located" means more than having physical presence or existence in a place, since the alternate venue referred to in § 19 (b) is "principal place of business." The Court of Appeals recognized the overlap between the two clauses inherent in its construction but resolved its doubts in favor of Tenth Circuit venue because the gas sold by Texaco under the contested contracts was produced in that circuit and the performance of the contract took place there.
The Act with which we deal was enacted August 26, 1935. At that time and down to the 1948 amendment of § 1391 of the Judicial Code, 28 U. S. C. § 1391 (c), the only residence of a corporation for purposes of federal venue was the State and district in which it had been incorporated. *39 See 9 Fletcher, Cyclopedia Corporations (1931), § 4385. That theme runs through the cases. See, e. g., Shaw v. Quincy Mining Co., 145 U. S. 444, 449-450. We conclude that, although "located" sometimes is used as indicating a place of business (Mercantile Nat. Bank v. Langdeau, 371 U. S. 555), in the setting of this Act "is located" and "resides" are equated and that "is located" refers in the case of Texaco to its State of incorporation. There is symmetry in that construction as the choice, so far as circuits are concerned, is then left between that State, the "principal place of business" (with no penumbra of other places of business, as here), or the District of Columbia where the Commission sits.
Texaco is a Delaware corporation and there is no claim that its principal place of business is within the Tenth Circuit. The Court of Appeals therefore erred in failing to dismiss its petition for lack of venue. There is, however, another respondent, Pan American, whose principal place of business is within the Tenth Circuit. We therefore proceed to the merits of its application.

II.
The main issue in the case is whether the "hearing" granted under § 4 (b) of the Administrative Procedure Act is adequate, so far as the price clauses are concerned, for purposes of § 7 of the Natural Gas Act. We think the Court of Appeals erred, that the present case is governed by the principle of United States v. Storer Broadcasting Co., 351 U. S. 192, and that the statutory requirement for a hearing under § 7 does not preclude the Commission from particularizing statutory standards through the rule-making process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived.
In Storer the Federal Communications Commission, pursuant to its general rule-making authority, limited *40 permissible multiple ownership for radio and television stations. Storer, which had seven radio stations and five television stations, was under that rule automatically disqualified for further licensing. To surmount that barrier it argued that the Act required a license to issue where the public interest would be served and that before an application could be denied, a hearing must be held. We said:
"We read the Act and Regulations as providing a `full hearing' for applicants who have reached the existing limit of stations, upon their presentation of applications conforming to Rules 1.361 (c) and 1.702, that set out adequate reasons why the Rules should be waived or amended. The Act, considered as a whole, requires no more. We agree with the contention of the Commission that a full hearing, such as is required by § 309 (b) . . . would not be necessary on all such applications. As the Commission has promulgated its Rules after extensive administrative hearings, it is necessary for the accompanying papers to set forth reasons, sufficient if true, to justify a change or waiver of the Rules. We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing. If any applicant is aggrieved by a refusal, the way for review is open." 351 U. S., at 205.
In the present case, as in Storer, there is a procedure provided in the regulations whereby an applicant can ask for a waiver of the rule complained of.[11] Facts might conceivably *41 be alleged sufficient on their face to provide a basis for waiver of the price-clause rules and for a hearing on the matter. Cf. Atlantic Refining Co., 28 F. P. C. 469; 29 F. P. C. 384. But no such attempt was made here by Pan American, the only respondent to which the present point has any immediate applicability.
The rule-making authority here, as in Storer, is ample to provide the conditions for applications under § 4 or § 7. Section 16 of the Natural Gas Act gives the Commission power to prescribe such regulations "as it may find necessary or appropriate to carry out the provisions of this Act." We deal here with a procedural aspect of a rate question and with a certificate question that is important in effectuating the aim of the Act to protect the consumer interest. Federal Power Comm'n v. Hope Natural Gas Co., 320 U. S. 591, 610. In a rate case under § 5 (a) of the Act the Commission can pass on existing contracts affecting rates, can find that particular contracts are "unjust, unreasonable, unduly discriminatory, or preferential" and thereupon has power to determine the "just and reasonable" rate or contract and "fix the same." And see United Gas Pipe Line Co. v. Mobile Gas Service Corp., 350 U. S. 332, 341. And where, as here, applications for certificates are made under § 7 of the Act, the Commission under § 7 (e) is required to control the terms and conditions under which natural gas companies, such as respondent, may initiate sales at wholesale of natural gas in *42 commerce. Atlantic Refining Co. v. Public Service Comm'n, 360 U. S. 378, 389.
Pan American does not disagree on that score; it insists that those changes and adjustments can be made only after an adversary hearing. To that there are two answers. The present regulations do not pass on the merits of any rate structure nor on the merits of a certificate of public convenience and necessity; they merely prescribe qualifications for applicants. Those qualifications are in the category of conditions that relate to the ability of applicants to serve the consumer interest in this regulated field. They are kin to the kind of capital structure that an applicant has and to his ability by reason of the rate structure to serve the public interest. It must be remembered that under this Act rate increases are initiated by the natural gas company, the Commission having the burden by reason of § 4 (e) of the Act to initiate a hearing on their legality with only a limited power to suspend new rates. See United Gas Pipe Line Co. v. Mobile Gas Service Corp., supra. Natural gas companies that seek to enter the field with prearranged escalator clauses and the like have a built-in device for ready manipulation of rates upward. Protection of the consumer interests against that device may be best achieved if it is given at the very threshold of the enterprise. At least the Commission may so conclude;[12] and *43 the legislative history makes clear that its authority reaches that far. H. R. Rep. No. 1290, 77th Cong., 1st Sess., pp. 2-3, states:
". . . The bill when enacted will have the effect of giving the Commission an opportunity to scrutinize the financial set-up, the adequacy of the gas reserves, the feasibility and adequacy of the proposed services, and the characteristics of the rate structure in connection with the proposed construction or extension at a time when such vital matters can *44 readily be modified as the public interest may demand. . . ." (Italics added.)
And see S. Rep. No. 948, 77th Cong., 2d Sess., pp. 1-2.
To require the Commission to proceed only on a case-by-case basis would require it, so long as its policy outlawed indefinite price-changing provisions, to repeat in hearing after hearing its conclusions that condemn all of them. There would be a vast proliferation of hearings, for as a result of Phillips Petroleum Co. v. Wisconsin, 347 U. S. 672, there are thousands of individual producers seeking applications. See Wisconsin v. Federal Power Comm'n, 373 U. S. 294, 300. We see no reason why under this statutory scheme the processes of regulation need be so prolonged[13] and so crippled.
Pan American finally argues that the "hearing" accorded it under § 4 (b) of the Administrative Procedure Act[14] did not comply with that Act nor with the Natural Gas Act. It points out that § 7 of the Natural Gas Act requires a hearing and that § 5 of the Administrative Procedure Act provides, with exceptions not relevant here, that a full-fledged adversary-type of hearing be held in "every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing. . . ." "Adjudication" is defined in § 2 (d) of the Administrative Procedure Act as "agency process for the formulation of an order"; "order" is defined as "the whole or any part of the final disposition . . . of any agency in any matter other than rule making but *45 including licensing." And "licensing" is defined as "agency process respecting the . . . denial . . . of a license." § 2 (e). What the Commission did in these cases, however, is not an "adjudication," not "an order," not "licensing" within the meaning of § 2. Whether Pan American can qualify for a certificate of public convenience and necessity has never been reached. It has only been held that its application is not in proper form because of the pricing provisions in the contracts it tenders. No decisions on the merits have been reached. The only hearing to which Pan American so far has been entitled was given when the regulations in question were adopted pursuant to § 4 (b) of the Administrative Procedure Act.
Reversed.
MR. JUSTICE STEWART, dissenting in part.
I agree with Part I of the Court's opinion, holding that the petition of Texaco Inc. should have been dismissed for lack of venue. I cannot agree, however, that a gas producer's application for a certificate of public convenience and necessity can be rejected without the full adjudicative hearing to which § 7 of the Act entitles him. My reasons are substantially those expressed in Judge Breitenstein's opinion for the Court of Appeals. 317 F. 2d 796, 804-807.
NOTES
[1] See Natural Gas Act, 52 Stat. 821-833, as amended, 15 U. S. C. §§ 717-717w; Phillips Petroleum Co. v. Wisconsin, 347 U. S. 672.
[2] See Order No. 174-B, 13 F. P. C. 1576, 18 CFR § 157.25; Order No. 232, 25 F. P. C. 379, 26 Fed. Reg. 1983, as amended by Order No. 232A, 25 F. P. C. 609, 26 Fed. Reg. 2850; Order No. 242, 27 F. P. C. 339, 27 Fed. Reg. 1356; Reg. § 154.91 et seq., as amended, 18 CFR (Cum. Supp. 1963) § 154.91 et seq.
[3] Section 154.93 defines the "permissible" provisions:

"(a) Provisions that change a price in order to reimburse the seller for all or any part of the changes in production, severance, or gathering taxes levied upon the seller;
"(b) Provisions that change a price to a specific amount at a definite date; and
"(c) Provisions that, once in five-year contract periods during which there is no provision for a change in price to a specific amount (paragraph (b) of this section), change a price at a definite date by a price-redetermination based upon and not higher than a producer rate or producer rates which are subject to the jurisdiction of the Commission, are not in issue in suspension or certificate proceedings, and, are in the area of the price in question . . . ."
[4] Ibid. For a discussion of escalation clauses see Pure Oil Co., 25 F. P. C. 383, aff'd 299 F. 2d 370.
[5] Ibid.
[6] § 157.25.
[7] § 157.14 (a) (10) (v).
[8] Section 4 (b) provides:

"After notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matter presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose. Where rules are required by statute to be made on the record after opportunity for an agency hearing, the requirements of sections 7 and 8 shall apply in place of the provisions of this subsection."
[9] Pan American's contracts provide (1) for a one-cent escalation in 1968, 1973, and 1978, and (2) for a redetermination of a "fair market price" in each five-year period commencing October 1, 1983, but in no event for less than 20.5 cents per thousand cubic feet.

Texaco's contract contained price clauses to become effective at definite times or upon the happening of definite circumstances in the future, e. g., the passage of 5, 10, or 15 years, increased taxation on the production, severance, gathering, transportation, sale, or delivery of gas or as a result of renegotiations undertaken six months prior to the beginning of the third (1974) and fourth (1979) of the four five-year periods into which the contract term was divided.
[10] See § 313 (b) of the Federal Power Act, 49 Stat. 860, 16 U. S. C. § 825l (b); cf. S. 1725, 74th Cong., 1st Sess., with S. 2796 of the same session.
[11] Regulation § 1.7 (b), 18 CFR (Cum. Supp. 1963) § 1.7 (b), provides in relevant part:

"A petition for the issuance, amendment, waiver, or repeal of a rule by the Commission shall set forth clearly and concisely petitioner's interest in the subject matter, the specific rule, amendment, waiver, or repeal requested, and cite by appropriate reference the statutory provision or other authority therefor. If a rate filing is accompanied by a request for waiver pursuant to this section the thirty-day notice period provided in section 4 (d) of the Natural Gas Act and section 205 (d) of the Federal Power Act shall begin to run if and when the Commission grants the request. Such petition shall set forth the purpose of, and the facts claimed to constitute the grounds requiring, such rule, amendment, waiver, or repeal, and shall conform to the requirements of §§ 1.15 and 1.16. Petitions for the issuance or amendment of a rule shall incorporate the proposed rule or amendment."
[12] The Commission in making the last amendment to the regulation now challenged said:

"Protection of the public interest is the touchstone of our regulatory powers under the Natural Gas Act. The Commission's obligation under the Act to the natural gas companies, as one segment of the public whose interest is to be protected, does not compel it to acquiesce in the use of contracts which carry provisions incompatible with a scheme of effective rate regulation. To be sure, the proposed rule will have impact upon contractual practices which have been fairly widespread. But the real issue is not one of `freedom of contract'; the question is whether the rule is rationally related to a condition which requires correction if regulatory objectives embraced by the statute are to be achieved. See American Trucking Associations v. United States, 344 U. S. 298. In our view, the rule we adopt fully meets this test.
"We held in the Pure Oil case [see note 4, supra] that indefinite escalation clauses are contrary to the public interest and restated this conclusion in Order No. 232A. Increases in producer prices, triggered by indefinite escalation clauses, have resulted in a flood of almost simultaneous filings. These filings bear no apparent relationship to the economic requirements of the producers who file them. The Natural Gas Act contemplates that prices, to be just and reasonable, be related to economic needs. The elimination of indefinite escalation provisions does not, of course, cut off other avenues by which a producer may make provision for filing for increased rates.
"Filings under indefinite escalation clauses have created a significant portion of the administrative burdens under which this Commission is laboring today. The Natural Gas Act contemplates that rate increases shall be sought when there is economic justification, but not that there shall be a chain reaction in a wide area whenever one producer in the area negotiates a contract at a new price level. The Act requires the Commission to give precedence to the hearing and decision of rate increases, but the complexity of indefinite price clauses requires it to spend an undue amount of time in their interpretation and application at the expense of making a prompt determination of the rate issues involved. Accordingly, in protecting the public against waves of increases which have no defensible basis, we also serve the needwhich we believe we should take into account of making the tasks of regulation more manageable." 27 F. P. C. 339, 340, 27 Fed. Reg. 1356, 1357.
[13] In one recent case seven years elapsed between the date of the new rate filing and the close of the review proceedings. Shell Oil Co., 18 F. P. C. 617, 19 F. P. C. 74, set aside sub nom. Shell Oil Co. v. Federal Power Comm'n, 263 F. 2d 223, rev'd sub nom. Texas Gas Transmission Corp. v. Shell Oil Co., 363 U. S. 263; on remand, aff'd sub nom. Shell Oil Co. v. Federal Power Comm'n, 292 F. 2d 149, cert. denied, 368 U. S. 915.
[14] See note 8, supra.