DISTRICT OF COLUMBIA INSUR-
ANCE GUARANTY
ASSOCIATION, Appellant,

v.

ALGERNON BLAIR, INC., Appellee.

No. 88–512.

District of Columbia Court of Appeals.

Argued May 22, 1989.
Decided Sept. 26, 1989.

H. Thomas Howell, with whom J. Snow-den Stanley, Jr. and Thomas G. Hagerty, Washington, D.C., were on the brief, for appellant.

Kenneth I. Johnson, with whom Ellen Kohn, Washington, D.C., was on the brief, for appellee.

Before ROGERS, Chief Judge, and MACK and BELSON, Associate Judges.

PER CURIAM:

This appeal grows out of an action by appellee Algernon Blair, Inc. ("Blair"), against appellant, the District of Columbia Insurance Guaranty Association ("DCIGA" or "the Association"), for payment of nine surety bonds. Upon the insolvency of the original surety, Blair sought payment of the bonds by DCIGA, a mandatory membership organization of insurers who do business in the District of Columbia, created by law to guarantee claims against insolvent member insurers. When DCIGA sought a declaratory judgment absolving it of liability on the bonds, the trial court dismissed its complaint and entered a declaratory judgment in favor of Blair. On appeal, DCIGA renews its contention that Blair's demands are not "covered claims" within the meaning of the District of Columbia Insurance Guaranty Association Act, D.C.Code §§ 35–1901 *et seq.* (1988 Repl.), because the claims fail to meet either of the two alternative predicates to "coverage" under the Act: the claimant is not a legal resident of the District of Columbia, and the claim does not "arise from" property permanently located within the District. Although the trial court ruled for Blair on both predicates, we reach only the latter issue, and resolving it in Blair's favor, we affirm.

I

A

Claimant-appellee Blair is a Delaware corporation with its principal place of busi-

ness in Montgomery, Alabama. On November 4, 1982, Blair qualified to transact business in the District of Columbia by obtaining from the Recorder of Deeds a certificate of authority pursuant to D.C. Code § 29–399(a) (1981). On November 8, 1982, Blair contracted to construct an equipment maintenance facility at the Ivy City Railroad Yard in Washington, D.C., for the National Railroad Passenger Corporation (Amtrak). On January 3, 1983, Blair entered into a subcontract to pay $2,431,-538.70 to Snow's General Services, Inc. ("Snow"), a contractor with its principal place of business in Richmond, Virginia, for structural demolition and excavation at the project site. This work was subsequently divided into nine separate subcontracts, secured by nine performance and payment bonds executed in Maryland on Snow's behalf by the Eastern Indemnity Company of Maryland ("Eastern").

Snow initiated work under four of the nine subcontracts in February 1983. By late March 1983, a dispute arose between Blair and Snow regarding Snow's inefficiency and undermanning of the work, which caused delays and complications for Blair and its other subcontractors. When, by repeated correspondence, Blair attempted to implement a priority work schedule, Snow responded with charges of harassment, and walked off the project. By telegram of April 15, 1983, Blair notified Eastern that Snow was in default under four of its subcontracts, and demanded Eastern's response as surety under Snow's bonds. Pursuant to a separate indemnity agreement with Snow, Eastern assumed the subcontracts and directed Blair to prosecute the subcontract work in the most economical fashion possible. Blair complied with this directive, charging Snow's accounts for expenses incurred and crediting them for progress payments received in performing the subcontracts.

Alleging that it had incurred losses under each of the nine subcontracts, in 1984 Blair sued Eastern for payment under the surety bonds. However, in February 1985 a Maryland circuit court adjudged Eastern

insolvent and ordered the cancellation of all the bonds it had issued. Consequently, on February 7, 1986, Blair submitted its claims to DCIGA for payment under the Insurance Guaranty Association Act, *supra*, which provides that the Association shall pay covered claims under policies issued by insolvent member insurers authorized to transact business in the District of Columbia. Although Eastern was authorized to transact business in the District, DCIGA denied the claims, contending that they were not "covered claims" under the Insurance Guaranty Act, since Blair was not a "resident" business entity of the District within the meaning of the Act, and the losses it sustained did not "arise from" property permanently located within the District, as the Act requires. Rejecting these contentions, the trial court awarded judgment to claimant Blair. This appeal followed.

B

The statute governing this case is the District of Columbia Insurance Guarantee Association Act, *supra*, which gave existence to appellant DCIGA. This statute was based on the Post–Assessment Property and Liability Insurance Guaranty Association Model Act ("Model Act"), prepared by the National Association of Insurance Commissioners in 1969. *See* H.R.Rep. No. 257, 93d Cong., 1st Sess., 1 (1973). Congress enacted this legislation

> to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.

D.C.Code § 35–1901. The District of Columbia Insurance Guaranty Association Act applies to all kinds of direct insurance except life, title, disability and mortgage guaranty insurance, and therefore its scope

includes claims of the kind now on appeal.[1]
*Id.,* § 35–1902. For purposes of the Act, [t]he term "covered claim" means an unpaid claim ... which arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy ... issued by an insurer, if such insurer becomes an insolvent insurer after August 14, 1973, and: (A) The claimant or insured is a resident of the District of Columbia at the time of the insured event; or (B) the property from which the claim arises is permanently located in the District of Columbia.

. . . .

*Id.,* § 35–1903(2). To come within the coverage of the Act, such an insolvent insurer must be a "member insurer" of DCIGA, licensed to issue insurance, *id.,* § 35–1903(4)(B), and authorized to transact business, *id.,* § 35–1903(3), within the District. A prerequisite of the insurer's authority to transact business within the District is its membership in DCIGA, a nonprofit unincorporated legal entity established to carry out the purposes of the Act, including the payment of claims against insolvent member insurers. *Id.,* §§ 35–1904, 35–1906(a)(1)–(2).

Because the original insolvent surety was a licensed "member insurer" authorized to do business in the District, the only question before this court is whether the claim on appeal meets either of the legal predicates of D.C.Code § 35–1903(2): legal residency of the claimant, or domestic origin of the claim.

## II

We choose to address only the disputed status of Blair's claim as arising from property permanently located in the District of Columbia, and conclude that the logic of the law, the syntax of the provision, the accepted meaning of the term "arising from," the internal consistency of the Act,

and the relative weight of the interests that the relevant jurisdictions have in the case, support "coverage" of the claim at issue in this appeal. We do not reach the issue of Blair's asserted residency for purposes of section 35–1903(2).

Undeniably, the Ivy City project site is permanently located in the District of Columbia. In arguing that the claim on appeal nevertheless does not "arise from" property permanently located in the District, DCIGA essentially relies on a two-part argument. First, DCIGA contends that for the purposes of the Insurance Guaranty Association Act, the property from which the claim arose was not the construction site, but Blair's right to Snow's performance on the nine subcontracts. This property, DCIGA asserts, was a chose in action, or object of intangible property, and therefore lacked definite or permanent situs. Second, because the Act defines a "covered claim" as an "unpaid claim ... which arises out of and is within the coverage ... of an insurance policy to which this chapter applies ... and ... (B) the property from which the claim arises is permanently located in the District of Columbia," D.C.Code § 35–1903(2), the Association contends that "the property from which the claim arises" must itself be covered by the policy for "coverage" to apply to the claim. DCIGA thus equates "the property from which the claim arises" with the insured object of the unpaid claim under the terms of the provision. For a claim to be within the coverage of a policy, appellant argues, it must therefore arise from property that is within the coverage of the policy. If recovery is sought for contractual nonperformance, it follows that the right to performance is the underlying property, and as a chose in action, that right can have no permanent location for the purposes of the Act.

1. We note that the original Post–Assessment Insurance Guaranty Association Model Bill excluded surety insurance from the scope of its coverage. Model Act § 3. In enacting this bill, however, our legislature opted to include surety insurance within the coverage of the District of Columbia Insurance Guaranty Association Act

(or stated differently, left off the exclusion of surety insurance). Putting aside any asserted difficulties this modification may have engendered, it is clear that the legislature intended to include claims of the type considered on this appeal within the scope of the Act.

The logic and legislative history of the Act do not support this approach. Notably, the Model Act excluded surety insurance from its scope. *See* Model Act § 3. Nevertheless, in enacting the District of Columbia Insurance Guaranty Association Act, Congress chose to omit this exclusion, and thus required DCIGA to guaranty surety bonds written by DCIGA members. We cannot read this conspicuous omission—the only change in scope from Model Act to District law—as accidental. Rather, it evinces an obvious intent to include surety guaranties within the scope of the legislation. Moreover, it would be inconsistent to include surety guaranties within the scope of the legislation, yet hold that such contracts, as choses in action, are excepted from DCIGA coverage because they are not themselves property permanently located in the District of Columbia. This would be to exclude nondomestic corporations entirely from the coverage of the Act, with respect to surety insurance, notwithstanding any significant contacts with or impact on the District such a contract had.

Both parties agree that in order to be a "covered claim," a claim must "arise from" property permanently located in the District of Columbia. They also agree that a chose in action, such as a contractual right to performance, is not property permanently located in the District. Their disagreement therefore lies in their divergent readings of the phrase "arising from." Under the Association's theory, a claim "arises from" the insured interest, which, in this case, is a contractual right to performance. Whether or not such a right is property, it lacks permanent location, and therefore cannot form the basis of a "covered claim" within the meaning of the Act. By contrast, under Blair's theory, a claim "arises from" any permanently located property to which it bears a substantial nexus: but for the presence of that underlying property, the claim would not exist. The claimant need not have an ownership interest in the underlying property itself; the claim must merely be predicated on some interest dependent on that property.

Manifestly, the Association's argument must stand or fall on the basis of its equa-tion of "the property from which the claim arises" with the insured object. Yet an examination of the language of section 35–1903(2) reveals that the clause referring to "the property from which the claim arises" is entirely independent of the clause that states the alternative additional requirement that the claim arise out of and be within the coverage of an insurance policy within the scope of the Act. Since, in a grammatical sense, neither clause of the provision modifies the other, only the following separate outcomes are compelled by the provision:

(1) A covered claim is an unpaid claim which arises out of and is within the coverage of an insurance policy to which the Act applies; and

(2) The property from which the claim arises must be permanently located in the District of Columbia.

The rules of grammar do not compel our finding that the objects of the two propositions are the same. On the contrary, the object of the first proposition is "an unpaid claim ... within the coverage of an insurance policy to which the Act applies," and that to which it is purportedly to be equated in the second proposition is "property ... permanently located within the District of Columbia," and notably, not "a *claim* arising out of property permanently located within the District of Columbia." These two objects are facially disparate. Had the drafters intended to equate them, they might simply have framed a single-clause provision defining a covered claim as "an unpaid claim for injury to property permanently located in the District of Columbia within the coverage of an insurance policy to which the Act applies." The fact that the drafters did not do so, but instead opted for a more complicated grammar, separating the insured object from "the property from which the claim arises," actually lends support to the view that they intended a distinction between the objects of the two clauses.

■ This view is reinforced by the drafters' choice of the broad term "arising from" rather than some modifier of the word "property" clearly identifying it as

the insured object for the injury of which the unpaid claim was lodged. It is well settled that statutory language employing the phrase "arising from" is broad, *Tandy & Wood, Inc. v. Munnell*, 540 P.2d 804, 806, 97 Idaho 142 (1975); *Fidelity & Casualty Co. v. North Carolina Farm Bureau Mutual Insurance Co.*, 192 S.E.2d 113, 118, 16 N.C.App. 194, *cert. denied*, 192 S.E.2d 840, 282 N.C. 425 (1972), and thus effects a "broad, general, and comprehensive" coverage. *Fidelity & Casualty, supra*, 192 S.E.2d at 118. It has been held to suffice, where a claim is said to "arise from" some predicate, that there be a "substantial connection" or nexus between that predicate and the claim. *Tandy & Wood, supra*, 540 P.2d at 806; *Hernandez v. Protective Casualty Insurance Co.*, 473 So.2d 1241, 1242 (Fla.1985). Direct causation is not required; it is enough that the claim would not have arisen but for the presence of the asserted predicate. *Auto–Owners Insurance Co. v. Transamerica Insurance Co.*, 357 N.W.2d 519, 521–22 (S.D.1984). In the case on appeal, it is fair to assert that there was a substantial connection between the Ivy City project and the injury alleged by appellee; but for its participation in the Ivy City project, appellee would have suffered no injury. In this sense, then, and accounting for the inherent breadth of the language chosen by the drafters, the claim "arose from" property permanently located in the District.

■ Moreover, the internal consistency of the Insurance Guaranty Association Act, which comprises a single, comprehensive legislative act, supports the proposition that the term "arising from" requires only a substantial connection between the permanently located property and the injury suffered, and not insurance of the underlying property. This is clear from a review of the provision in the Act which addresses the possible duplication of recovery in foreign workers' compensation claims. To avoid such duplication, section 35–1910(b) requires, among other things, that a person having a worker's compensation claim "seek recovery first from the association of [his] residence." From this it is clear that a foreign claimant could seek recovery from DCIGA if recovery were unavailable from an insurance guaranty association in his home state. But it is also obvious that the insured object in a worker's compensation claim is the worker's ability to perform work, an object of intangible property which, like a chose in action, cannot have a permanent location. Thus, if we are to credit the Association's argument that a claim cannot "arise from" an object of intangible property permanently located in the District, then a foreign worker should never have a claim against DCIGA, since such a claim would necessarily infract that very rule. The fact that section 35–1910(b) does make provision for such a claim belies DCIGA's argument, and demonstrates that claims "arising from" property located in the District must encompass claims substantially connected with that property, even if the property itself is not the insured object.

Finally, an analysis of the interests involved in this case supports the broad interpretation described above. In the case on appeal, a foreign corporation sought to insure work undertaken on a major project in the District by contracting with an insurer authorized to do business here. The jurisdiction with the greatest interest in the transaction is the District of Columbia, where the project was undertaken. Maryland has relatively little interest in protecting a foreign company doing construction work in the District of Columbia from the insolvency of a Maryland insurer, since neither the claimant nor the insured activity was located within its jurisdiction. Further, there is no record evidence that Eastern was even a member of an insurance guaranty association in Alabama, the claimant's legal domicile. Only the District of Columbia, as the situs of the underlying project, had a meaningful interest in enforcing the claim.[2]

---

2. While, strictly speaking, the issue on appeal is not a conflict of law problem, the Restatement (Second) of Conflict of Laws § 188 (1971) is instructive as to the relative interests of the jurisdictions connected with this suit. It identifies five relevant contacts that must be weighed

III

In short, we conclude that the logic and grammar of this legislation, and the statutory phrase "arising from," as it is used in that provision, must be construed broadly in determining the location of an interest that has suffered injury, and therefore, that claims "arising from" property permanently located in the District include those substantially connected with contract work performed on another's property here. This conclusion is supported by the requirements of internal consistency of the statute and by our analysis of relevant jurisdictional interests. Thus, appellee's claims were within the coverage of the Insurance Guaranty Association Act, and the trial court properly entered summary judgment. Accordingly, the judgment on appeal is

*Affirmed.*

MACK, Associate Judge, concurring:

I concur fully in the per curiam opinion. I write separately only to discuss issues raised by the alternative ground for affirmance urged by appellee, which we do not reach today, and to express my concerns about the implications of that approach. In particular, I suggest that as a mandatory rule of statutory construction, D.C.Code § 29–399.1 (1981) requires us to afford appellee all the rights and privileges of a domestic corporation, including those rights afforded a District of Columbia resident under D.C.Code § 35–1903(2) (1988 Repl.). I am troubled, however, that this result would necessarily permit claimants with minimal contacts with this jurisdiction to lodge successful claims with our Insurance Guaranty Association.

I

Appellant denies claimant-appellee's District of Columbia residency within the meaning of the statute, and therefore contends that claimant-appellee cannot claim residency as a basis for coverage. The statute itself, however, does not define the terms "resident" or "residence," and the Comment to the Model Act indicates that the term "residence" is to be determined by local law. Model Act § 5(3), Comment. "This is especially true in relation to corporations," the Comment stresses, "for the subcommittee feels the 'residence' of a corporation should not necessarily be equated with its domicile." *Id.*

Appellant argues that our local law equates a corporation's legal residence with its place of incorporation. Indeed, at least in cases involving federal diversity jurisdiction and attachment, there is overwhelming authority that corporations legally reside only in the jurisdictions where they have

---

in determining the governing law: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

In the case on appeal, Maryland was the place where the contract was technically executed, and therefore it is the "place of contracting." It is notable, however, that "[s]tanding alone, the place of contracting is a relatively insignificant contact." *Id.*, Comment e. However, because the parties were variously domiciled and negotiated across several jurisdictions, neither the place of negotiation nor the domiciles of the parties is dispositive here. *Id.* (place of negotiation "is of less importance when there is no one single place of negotiation and agreement"; domicile only "assumes greater importance when combined with other contacts"). The Restatement instructs us that the remaining contacts, *i.e.*, the place of performance and the situs of the subject matter, both favor the District of Columbia's interest:

When the contract deals with a specific physical thing, such as land or a chattel, or affords protection against a localized risk ... [t]he state where the thing or the risk is located will have a natural interest in transactions affecting it. Also the parties will regard the location of the thing or of the risk as important. Indeed, when the thing or the risk is the principal subject of the contract, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the thing or risk was located would be applied to determine many of the issues arising under the contract.

*Id.* Since the risk secured by the surety bonds was that Snow would fail to perform adequately under the nine subcontracts on a project located in the District of Columbia, both the risk and the performance contemplated by the surety bonds were within the District. The combination of these contacts gives the District the most substantial interest in the outcome of this suit.

been incorporated. *Federal Power Commission v. Texaco,* 377 U.S. 33, 38, 84 S.Ct. 1105, 1109, 12 L.Ed.2d 112 (1964); *Neirbo Co. v. Bethlehem Corp.,* 308 U.S. 165, 169, 60 S.Ct. 153, 155, 84 L.Ed. 167 (1939); *Shaw v. Quincy Mining Co.,* 145 U.S. 444, 450, 12 S.Ct. 935, 937, 36 L.Ed. 768 (1892); *Ex parte Schollenberger,* 96 U.S. 369, 377, 24 L.Ed. 853 (1878); *Hazen v. National Rifle Association of America, Inc.,* 69 U.S. App.D.C. 339, 344, 101 F.2d 432, 437 (1938); *Barbour v. Paige Hotel Co.,* 2 App.D.C. 174, 179 (1894). It is also well settled in this jurisdiction that "the words 'inhabitant' and 'resident in' ... mean neither more nor less than legal domicile." *King v. Wall & Beaver Street Corp.,* 79 U.S. App.D.C. 234, 236, 145 F.2d 377, 379 (1944). This is so because a corporation is an artificial being that exists only in the contemplation of the laws of the chartering state, and thus enjoys legal existence only as far as that state's boundaries. *Barbour, supra,* 2 App.D.C. at 179. It must dwell at the place of its creation, and cannot "migrate" from state to state. *Neirbo, supra,* 308 U.S. at 169, 60 S.Ct. at 155; *Schollenberger, supra,* 96 U.S. at 376. It is usually irrelevant, therefore, that a corporation does all its business in one state, if its legal domicile is in another; only the latter is its "residence." *Barbour, supra,* 2 App.D.C. at 178.

Notwithstanding this rule, however, other statutory and common-law indicia of corporate presence are not uncommon.[1]

Recognizing the economic and social advantages of attracting and regulating the business of foreign corporations, states have typically enacted legislation making the rights and privileges of local incorporation available to them upon the fulfillment of certain conditions, such as the filing of papers and the designation of a local agent for service of process. *See* FLETCHER CYC. CORP. § 8446 (Perm. Ed.1983). The purposes of such conditions include the placement of foreign corporations on an equal footing with domestic corporations, their subjection to inspection, the protection of state residents by making foreign corporations subject to local suit, and the collection of taxes and fees. *Id.* Such purposes are not uniformly served by treating foreign corporations as if they have no presence within the jurisdiction.[2]

In this instance, Congress has made its intention evident, not only with respect to the proper interpretation of the Insurance Guaranty Association Act, but with respect to other laws using similar language, by enacting a statutory rule of construction, D.C.Code § 29–399.1 (1981). Under section 29–399.1,

A foreign corporation which shall have received a certificate of authority under this chapter shall, until a certificate of revocation or of withdrawal shall have been issued as provided in this chapter, enjoy the same rights and privileges as, but no greater rights and privileges than,

1. *See, e.g.,* 28 U.S.C. § 1332(c) (1982 & Supp. V 1987) (for purposes of federal diversity or removal jurisdiction "a corporation shall be deemed a citizen of any State by which it has been incorporated or where it has its principal place of business"); *Federal Power Commission v. Texaco, supra* 377 U.S. at 37–38, 84 S.Ct. at 1108–1109 (construing statute allowing federal venue based on corporate "location" or "principal place of business"); *Schollenberger, supra* at 376 (construing statute granting jurisdiction over corporations "found" within state to include foreign corporations consenting to be sued); *Bergen Shipping Co., Ltd. v. Japan Marine Services, Ltd.,* 386 F.Supp. 430, 433–34 (S.D. N.Y.1974) (foreign corporation with principal place of business in state deemed a citizen of the state for purposes of federal diversity jurisdiction).

2. As Fletcher's treatise on corporations remarks:

[G]enerally speaking, a corporation is regarded as a "citizen," "resident," "inhabitant" ... whenever and to the extent that this becomes necessary to give full effect to the purpose and spirit of the statute or constitution and the words thereof will permit such a construction. Consequently, whether a corporation is included within such a provision depends largely upon its object.

*Id.,* § 8300. Thus, for purposes of statutory construction, the terms "foreign corporation" and "nonresidential corporation" are not necessarily synonymous. *Id.* Further, questions regarding domicile or corporate residence may arise under widely different statutory provisions in connection with such diverse issues as jurisdiction, attachment, taxation, and bankruptcy, and must be treated individually, "in connection with the particular question or phase of law in which they arise." *Id.*

a domestic corporation ... and, except as in this chapter otherwise provided, shall be subject to the same duties, restrictions, penalties, and liabilities now or hereafter imposed upon a domestic corporation of like character.

Thus, except to the extent specially treated by statute, foreign corporations qualified to transact business within the District of Columbia must enjoy the same status as domestic corporations, at least inasmuch as they are subject to the same rights, privileges, duties, restrictions and liabilities, as domestic corporations. *Indian Lakes Estates, Inc. v. Ten Individual Defendants*, 121 U.S. App.D.C. 305, 309–10, 350 F.2d 435, 439–40, *cert. denied*, 383 U.S. 947, 86 S.Ct. 1199, 16 L.Ed.2d 209 (1966). While this does not necessarily mean that the term "domestic corporation," wherever it is used in a statute, includes qualified foreign corporations, it does mean that any statute granting a right to, or imposing a restriction or liability upon, a domestic corporation, necessarily, and in like manner, qualifies the status of a foreign corporation authorized to transact business in the District of Columbia. Thus, even if application of the term "resident" is restricted to corporations chartered in the District of Columbia, foreign corporations authorized to do business here are entitled to the rights of residency to the same extent as domestic corporations, except where the statute granting these rights explicitly withholds them from authorized foreign corporations. Nothing in the Insurance Guaranty Association Act restricts its scope in this way.

Nevertheless, citing *Jennings v. Idaho Railway, Light and Power Co.*, 146 P. 101, 103, 26 Idaho 703, 705 (1915), appellant contends that a statute conferring the rights, privileges, liabilities and restrictions of domestic incorporation on a foreign entity does not thereby confer residency upon it, but merely the enumerated incidents of residency.[3] *Id.* To the extent, therefore, that the Insurance Guaranty Association Act predicates the granting of legal status on residency, it is argued that claimant-appellee's failure to establish residency is fatal to its claim. I think that this argument falls short, however, because it confuses the logic of appellee's claim. The claim is perhaps best understood as an argument about the order of reasoning required in interpreting the applicable statutes. Appellant's argument is, in effect, that because appellee is not a resident of the District, it is unentitled to benefits predicated on District residency under section 35–1903(2)(A). Most cogently stated, however, appellee's position is that section 29–399.1, applied *after* the determination of rights appellee would have *if it were a* District resident under section 35–1903(2)(A), grants appellee exactly the same rights. Moreover, inasmuch as nothing in section 29–399.1 purports to transform appellee into a District resident, but only to grant it rights identical to those of a District resident, section 29–399.1 is properly applied only after a *resident's* rights are determined under section 35–1903(2). Appellant cannot circumvent the effect of section 29–399.1 by arguing as if that section were to be applied prior to the application of section 35–1903(2)(A).

Thus, consistent with the court's holding in *Indian Lakes, supra*, the statute does not confer residency upon claimant-appellee, but it does confer the legal *status* of a resident upon it. As this implies, the issue is not whether claimant-appellee failed to establish residency as a predicate to its enjoyment of rights granted by the Insurance Guaranty Association Act, but whether its compliance with section 29–399.1 enti-

3. *But see Charles Friend & Co. v. Goldsmith & Seidel Co.*, 138 N.E. 185, 307 Ill. 45 (1923): While the act does not declare foreign corporations complying with its terms to be domestic corporations nor purport to adopt the foreign corporations, it does clothe foreign corporations with the same powers, rights, and privileges, and imposes upon them the same liabilities and duties, as domestic corporations. There is essentially no difference between the foreign and domestic corporation. The intention was to obliterate any distinction in the treatment of domestic corporations and foreign corporations which had complied with the act. The effect was to give the foreign corporation the same standing in the eye of the law as the domestic corporation, giving it the same rights and subjecting it to the same remedies....

tled it to enjoy rights otherwise granted only to domestic corporations under that Act. Since the right to recover under the Insurance Guaranty Association is vouchsafed to domestic corporations, and no provision expressly excludes foreign corporations from this right, it follows that such compliance did entitle claimant-appellee to enjoy those rights under section 29–399.1.[4]

I believe appellant's contention that this reading of section 29–399.1 gives a domestically insured foreign corporation preferred status *vis-a-vis* domestic corporations lacks merit. Of course, section 29–399.1 purports to give authorized foreign corporations "the same rights and privileges as, but no greater rights and privileges than, a domestic corporation...." *Id.* Appellant argues that since the Insurance Guaranty Association Act was passed to benefit policyholding District residents, who must ultimately absorb the expenses and claims paid by DCIGA, a foreign corporation would enjoy preferred status if deemed (or given rights equivalent to those of) a "resident" for purposes of section 35–1903(2)(A). However, as an insured under the Eastern indemnity policy, appellee was, like any domestic claimant, a participant in the Insurance Guaranty Association funding scheme, and thus enjoyed no "free ride," as appellant suggests.[5] Indeed, having undertaken the costs and obligations of obtaining legal rights and privileges equivalent to those of a domestic corporation under 29–399.1, and having paid premiums to Eastern (and thus, indirectly, to DCIGA) for the benefit of indemnity coverage, appellee would be placed at a distinct disadvantage if its premiums did not entitle it to the same protections afforded domestic claimants. It would indeed be unfair to an authorized foreign corporation to compel it to pay indirect DCIGA premiums but withhold the benefit of DCIGA coverage. To the extent that appellee has supported our insurance guaranty system, we should not countenance its exclusion from the benefits of that system.

**4.** Nor does an examination of the Act's underlying purposes suggest that it was intended to exclude foreign corporations authorized to transact business in the District of Columbia. The Comment to the analogous provision of the Model Act states that the purpose of the Act is "to avoid financial loss to claimants or policyholders because of the insolvency of an insurer," and thus indicates no distinction between domestic and foreign claimants with substantial interests in the locale. While there is perhaps a superficial preference for protecting the interests of domestic corporate and natural persons, this preference is negated by the obvious policy advantages of protecting all enterprises that seek to participate in and thereby enrich the local market. As the per curiam opinion shows, the jurisdiction with the greatest interest in the transaction is the District of Columbia, where the project was undertaken. It is also implausible that Congress intended to exclude foreign corporations from the protection of the Act, where such an exclusion would place domestically licensed insurers at a disadvantage in competing with insurers licensed in a foreign corporation's home jurisdiction for the opportunity to insure contracts entered in the District of Columbia.

**5.** Under the statutory funding scheme, D.C.Code § 35–1906 (1988 Repl.), DCIGA is supported by assessments charged against member insurers. These assessments are calculated according to a formula representing the ratio of net direct written premiums of a particular insurer ($N_1$) to net direct written premiums of all member insurers

($N_a$). *Id.* Net direct written premiums are gross premiums written in the District of Columbia on all policies to which the law applies (G), less return premiums on the same policies (R) and dividends paid to policyholders (D). D.C.Code § 35–1903(5) (1988 Repl.). The assessment formula may be rendered thus:

$$\text{Assessment} = \frac{N_1}{N_a} \text{ where } N_i = G - (R + D).$$

As appellant has argued, this formula offers no assurance that any part of the particular premium paid by appellee in fungible dollars ever found its way into the DCIGA fund, since the insurer's assessment is derived from its net direct written premiums, and not from the premiums paid by any particular policyholder. The same can be said, however, of all policyholders. The premium paid by appellee was presumably no less than that a domestic policyholder would pay for like insurance under the same circumstances, and like the premium paid by that domestic policyholder, was a function of all the premiums collected and expenses incurred by the insurer, including the cost of assessments paid by the insurer to DCIGA. *See* D.C.Code § 35–1914 (1988 Repl.). Had there been a substantial reduction in those assessments, appellee's premium, like those of all other policyholders, would have been reduced in some measure. Thus, inasmuch as the rate of appellee's premium depended on the rate of assessment DCIGA imposed on its insurer, appellee can be said to have paid a share of the assessment to DCIGA.

## II

For these reasons, I believe that section 29–339.1 compels the granting to authorized foreign corporations of the rights afforded domestic corporations under section 35–1903(2). Regardless of the policies or interests involved, that is the plain reading of the mandatory import of these laws. I am nonetheless troubled by an extreme case that such a reading might fail to preclude, for it appears possible for an authorized foreign corporation to obtain insurance of an out-of-state risk from a foreign insurer with DCIGA membership, and successfully lodge a claim with DCIGA upon the failure of the foreign insurer, despite the District's obvious indifference to the claim involved.

While section 35–1903(2) must be read together with section 29–399.1, a plain reading of the former makes it evident that the legislature intended to guaranty claims with a stronger nexus to the District than that presented by the foreign insured interest of a foreign corporation. The legislature apparently intended to protect claims by domestic corporations or involving domestic property. But because the District grants authorized foreign corporations the same rights as domestic corporations, an enterprising lawyer for a foreign corporation doing all of its business outside the District, chartered in a state that lacks provision for the guaranty of insurance policies, could advise her client to obtain a District of Columbia certificate of authority and insurance from a DCIGA member in order to obtain a DCIGA guaranty. DCIGA would find itself guarantying many transactions having no connection with the District of Columbia, at the expense of DCIGA members and their customers.

I emphasize, of course, that this is not the case before us, for the District retains a strong interest in contracts, like appellee's, that are to be performed within its jurisdiction. *See supra* note 4. This court would indeed be overreaching if, in a holding, it addressed problems unnecessary to reach, and the per curiam opinion properly limits itself to all that is necessary to decide this case. Because I am concerned, however, that the "residency" argument may open an opportunity for abuse, and that nothing in the statutes limits its applications in such a way as to preclude such abuse, I take this opportunity to suggest a legislative response.

Having expressed my concerns, I am happy to join the per curiam opinion.